**UNITED STATES of America**

**v.**

**George Gordon LIDDY et al.**

**Crim. No. 1827-72.**

United States District Court, District of Columbia.

June 20, 1975.

Peter L. Maroulis, Poughkeepsie, N. Y., for George Gordon Liddy.

Watergate Special Prosecution Force, Henry Ruth, Sp. Prosecutor, and Kenneth S. Geller, Asst. Sp. Prosecutor, for the United States.

*MEMORANDUM OPINION AND ORDER*

SIRICA, District Judge.

This matter comes before the Court on the motion of the defendant George Gordon Liddy for a reduction of sentence, filed May 19, 1975. The Court has carefully reviewed this motion and the memorandum filed in support thereof, and has taken into consideration all of those factors which are usually considered by most judges when passing upon such motions.

The provision for such a motion under Rule 35 of the Federal Rules of Criminal Procedure is intended to provide a means by which a convicted defendant may have a second chance before a sentencing judge, while giving the judge an opportunity to reconsider the initial sentence imposed in light of any further information concerning the defendant or the case which might have arisen and been brought to the attention of the Court in the interim. *United States v. Ellenbogen,* 390 F.2d 537, 543 (2 Cir.)

---

*cert. denied* 393 U.S. 918, 89 S.Ct. 241, 21 L.Ed.2d 206 (1968).

When this defendant was sentenced, the Court mentioned the four principal reasons for imposing sentences. It was noted at that time that reprisal was not an appropriate purpose for which to sentence this defendant, and that rehabilitation, although considered, was not the principal consideration. The Court, however, emphasized the purposes of imposing just punishment for the grave offenses committed and of deterring others from engaging in such reprehensible conduct.

■ The deterrent effect of the sentences, as one of the primary reasons for prescribing the term of incarceration for the defendant, is no less important now than it was at the time of his initial sentencing. As the prosecutor stated at that time:

" . . . What these defendants have done . . . is not only violate the freedom of association of a major political party but perhaps more important . . . what they have done is to generate a fear . . . that this illegal activity, wiretapping, bugging and burglary for political purposes, is both widespread and condoned.

. . . [I]t is important that the sentences imposed in this case . . . respond to this fear by deterring future conduct of this kind and by demonstrating that this kind of conduct will not be tolerated." [1]

Similarly, the purpose of imposing punishment appropriate for the grave offenses of which the defendant was convicted has not been negated by the facts, circumstances or events which have come to the attention of the Court in the interim.

The rehabilitative purpose to be served by Mr. Liddy's sentence must also be reconsidered. The need for the personal rehabilitation of this defendant has assumed even greater importance than it had two years ago due to the events that have occurred in the interim. A review of his present criminal record is revealing. When this defendant first appeared before the Court he had no criminal record, having never before been sentenced to jail or even having been convicted of an offense more serious than a traffic violation. However, on March 23, 1973, when he stood before this Court to be sentenced, he stood convicted of two counts of burglary, two counts of intercepting wire communications, one count of intercepting oral communications and one count of conspiracy. Since then, the defendant has been convicted by another jury of another felony charge, namely, conspiracy to violate the rights of a citizen; he has been found guilty of statutory contempt of court for refusing to testify before a Federal Grand Jury; and has been found guilty by another federal judge of contempt of Congress for refusing to testify before a Congressional Committee. With the exception of the statutory contempt conviction, the sentences the defendant received for his other convictions were either suspended or made to run concurrently with the sentences imposed by this Court.

Subsequent to his conviction and sentencing in this case, the defendant had several opportunities to provide valuable assistance to governmental investigating units by testifying as to his knowledge of certain alleged illegal activities. He was even granted immunity from prosecution for the testimony which he was subpoenaed to give. Yet, he refused to cooperate. It is reasonable for the Court to assume that this defendant had reason to know and believe that any further consideration he might receive from the Court concerning his sentence might be affected by his conduct after sentencing. In fact he was present in the courtroom when his co-defendants were specifically informed that their coopera-

[1]. Transcript of March 23, 1973, pp. 13, 14 (attached hereto as an appendix and hereinafter referred to as "Transcript").

tion with the grand jury and the Senate Select Committee would be a relevant factor which the Court would consider in determining their final sentences.

At that time this court stated to all of the defendants in the presence of Mr. Liddy:

" . . . [N]one of you have been willing to give the government or other appropriate authorities any substantial help in trying this case or in investigating the activities which were the subject of this case.

I think under the law, the Court is entitled to consider this fact in determining sentences.

\* \* \* \* \* \*

I believe I may also properly suggest to you that in the interval between now and the time when the Bureau of Prisons studies are completed, you give serious consideration to lending your full cooperation to investigating authorities.

Now I want to speak plainly about this matter. You will, no doubt, be given an opportunity to provide information to the grand jury which has been, and still is, investigating the Watergate affair and to the Senate Select Committee on Presidential Campaign Activities.

I sincerely hope that each one of you will take full advantage of any such opportunity . . . .

\* \* \* \* \* \*

Now I believe that the Watergate [Break-in] affair . . . should not be forgotten. Some good can and should come from a revelation of sinister conduct whenever and wherever such conduct exists. I am convinced that the greatest benefit that can come from this prosecution will be its impact as a spur to corrective action so that the type of activities revealed by the evidence at trial will not be repeated in our nation.

For these reasons, I recommend your full cooperation with the grand jury and the Senate Select Committee. You must understand that I hold out no promises or hopes of any kind to you in this matter but I do say that should you decide to speak freely I would have to weigh that factor in appraising what sentence will be finally imposed in this case. Other factors will, of course, be considered but I mention this one because it is one over which *you have control* and I mean each and every one of you." [2]

Yet, despite this admonition by the Court and the fact that the Court subsequently gave consideration to other defendants on this basis, this defendant chose to continue to refuse to cooperate with the government investigations.

In short, this defendant has not shown the Court the slightest remorse or regret for his actions, and has not given the Court even a hint of contrition or sorrow, nor has he made any attempt to compensate for his illegal actions by trying to aid our system of justice in its search for the truth.

This defendant's obstinate disregard for the processes of law is difficult for the Court to comprehend. As was acknowledged on the day of sentencing, this defendant "has throughout his adult life been very interested and involved with the law . . . [and] been deeply involved in the law." [3] Clearly this is not the case in which one who is disadvantaged or uneducated breaks the law. This defendant is a well-educated man who has had considerable experience with the law and politics, having been a lawyer, an assistant district attorney, an FBI special agent, a Congressional candidate, a special assistant in the Organized Crime Section of the Treasury Department, and a White House aide. The Court noted when it sentenced the defendant:

"Now it is true that 'ignorance of the law is no excuse,' and that one may be held accountable for a failure to obey the law whether he has read

---

2. Transcript, pp. 35–36, 39–40 (emphasis added).

3. Transcript, pp. 11, 12.

the statute books or not. Despite this fact, however, the Court believes that the knowing and deliberate violation of laws deserves a greater condemnation than a simple careless or uncomprehending violation." [4]

Mr. Liddy, in his motion for reduction of sentence, also specifically requests that the fines imposed at the time of sentencing be vacated. However, the Court notes that the defendant has not cooperated with investigators even so much as to try to explain whatever became of the approximately $199,000 which testimony at trial indicated was dispersed to Mr. Liddy.[5]

The Court sees no reason to vacate the fine. Should the defendant be unable to pay the fine at the time when he has served his sentence, he will then have the opportunity to take a pauper's oath under the applicable statute (18 U.S.C. § 3569). At that time he will be able to satisfy this portion of his sentence by serving an additional thirty days imprisonment.

In conclusion, the mitigating factors inherent in those cases in which a defendant has displayed some personal remorse or regret for his actions and has demonstrated a desire to reform his conduct to conform to the simple standards of a lawful society are absent in this case.

In the interim which has passed since the Court sentenced the defendant in this case, no information has been brought to the attention of the Court which would move this Court to reduce the sentence of the defendant. The Court can only repeat what it stated at the initial sentencing of Mr. Liddy:

"I shall not attempt to enumerate every item which the Court has pondered. Numerous other considerations, both favorable and unfavorable to the defendants, have played a part in the Court's decisions. Suffice it to say that the sentences which the Court will now impose, are the result of careful thought extending over a period of several weeks. I think the sentences are appropriate and just." [6]

For the reasons above stated, it is this 20th day of June, 1975,

Ordered that the defendant's motion for reduction of sentence be, and the same hereby is, denied.

## APPENDIX

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

vs

GEORGE GORDON LIDDY, et al
Criminal No. 1827–72

(Friday, March 23, 1973

The defendants in the above-entitled cause appeared before THE HONORABLE CHIEF JUDGE JOHN J. SIRICA for sentencing at 10:00 o'clock a. m.

APPEARANCES:

On Behalf of the United States:

EARL SILBERT, Ass't. U. S. Attorney

SEYMOUR GLANZER, Ass't. U. S. Attorney

DONALD CAMPBELL, Ass't. U. S. Attorney

On Behalf of Defendant Liddy:

PETER MAROULIS, Esq.

THOMAS A. KENNELLY, Esq.

On Behalf of Defendant Hunt:

WILLIAM O. BITTMAN, Esq.

AUSTIN S. MITTLER, Esq.

On Behalf of Defendant McCord:

GERALD ALCH, Esq.

BERNARD SHANKMAN, Esq.

On Behalf of Defendants Bernard Barker, Eugenio Martinez, Frank Sturgis, and Virgilio Gonzalez:

DANIEL SCHULTZ, Esq.

PROCEEDINGS

(Defendants present in court.)

THE COURT: Good morning.

---

4. Transcript, p. 15.

5. Transcript of Trial, *United States v. George Gordon Liddy, et al.*, Criminal No. 1827–72, pp. 1448–1449.

6. Transcript pp. 16, 17.

I have a preliminary matter which we will consider before arguments on the motions and sentencing.

The defendant Mr. McCord sent a letter to me last Tuesday, March 20th, by way of a probation officer. In the presence of the probation officer, my two law clerks and the court reporter I opened the envelope and read into the record the two enclosures it contained. The letters and the transcript were then sealed until further order of the Court. I have considered this communication from Mr. McCord as a supplement to the presentence report in his case. I am now ordering unsealed those letters and the transcript of proceedings of March 20, 1973. They will be filed in the record. The two letters are brief and I will read them now for the benefit of counsel before we proceed further. Let me have the letter.

(The clerk unsealed the envelope and handed the contents to the Court.)

The first one I shall read is a copy of a letter dated March 19, addressed to Mr. Walter Rugaber of the New York Times, Washington, D. C.:

"Dear Mr. Rugaber:

"The New York Times issue of March 19, 1973, page 30 carries a story relative to an alleged strong-arm activities attributed to Mr. Bernard Barker and associates by one Reinaldo Pico. In the article by juxtaposition my name is mentioned in connection with such activities.

"As I have telephonically advised your office after seeing the article I have no knowledge of or connection with any such strong-arm activities referred to in the article. Neither have I ever met Mr. Pico to my knowledge.

"You made no effort to contact my attorneys or me prior to publication of the article which I regret since we could have stated for publication what I just said above.

Very truly yours,

James W. McCord, Jr."

The other letter dated March 19 on the letterhead of James W. McCord, Jr., 7 Winder Court, Rockville, Maryland, addressed to Judge Sirica states:

"Certain questions have been posed to me from your honor through the probation officer, dealing with details of the case, motivations, intent and mitigating circumstances.

"In endeavoring to respond to these questions, I am whipsawed in a variety of legalities. First, I may be called before a Senate Committee investigating this matter. Secondly, I may be involved in a civil suit; and thirdly there may be a new trial at some future date. Fourthly, the probation officer may be called before the Senate Committee to present testimony regarding what may otherwise be a privileged communication between defendant and Judge, as I understand it; if I answered certain questions to the probation officer, it is possible such answers could become a matter of record in the Senate and therefore available for use in the other proceedings just described. My answers would, it would seem to me, to violate my Fifth Amendment rights, and possibly my Sixth Amendment right to counsel and possibly other rights.

"On the other hand, to fail to answer your questions may appear to be non-cooperation, and I can therefore expect a much more severe sentence.

"There are further considerations which are not to be lightly taken. Several members of my family have expressed fear for my life if I disclose knowledge of the facts in this matter, either publicly or to any government representative. Whereas I do not share their concerns to the same degree, nevertheless, I do believe that retaliatory measures will be taken against me, my family, and my friends should I disclose such facts. Such retaliation could destroy careers, income, and reputations of persons who are innocent of any guilt whatever.

"Be that as it may, in the interests of justice, and in the interests of restoring faith in the criminal justice system, which faith has been severely damaged in this case, I will state the following to you at this time which I hope may be of help to you in meting out justice in this case:

"1. There was political pressure applied to the defendants to plead guilty and remain silent.

"2. Perjury occurred during the trial in matters highly material to the very structure, orientation, and impact of the government's case, and to the motivation and intent of the defendants.

"3. Others involved in the Watergate operation were not identified during the trial, when they could have been by those testifying.

"4. The Watergate operation was not a CIA operation. The Cubans may have been misled by others into believing that it was a CIA operation. I know for a fact that it was not.

"5. Some statements were unfortunately made by a witness which left the Court with the impression that he was stating untruths, or withholding facts of his knowledge, when in fact only honest errors of memory were involved.

"6. My motivations were different than those of the others involved, but were not limited to, or simply those offered in my defense during the trial. This is no fault of my attorneys, but of the circumstances under which we had to prepare my defense.

"Following sentence, I would appreciate the opportunity to talk with you privately in chambers. Since I cannot feel confident in talking with an FBI agent, in testifying before a Grand Jury whose U. S. Attorneys work for the Department of Justice, or in talking with other government representatives, such a discussion with you would be of assistance to me.

"I have not discussed the above with my attorneys as a matter of protection for them.

"I give this statement freely and voluntarily, fully realizing that I may be prosecuted for giving a false statement to a Judicial official, if the statements herein are knowingly untrue. The statements are true and correct to the best of my knowledge and belief.

James W. McCord, Jr."

We will take a 20 minute recess and I will hear any comments from any attorneys on this.

(Brief recess taken at 10:10 a. m.)

*AFTER RECESS*—10:40 a. m.

(Defendants present in the courtroom.)

THE COURT: Mr. Maroulis, I will hear you in connection with the motions you filed.

MR. MAROULIS: Your Honor, I am submitting on both of those motions.

THE COURT: Are you ready, counsel?

MR. ALCH: Your Honor, without intending to undermine the issues raised in my motion, I also submit on the papers filed.

THE COURT: The motions will be denied.

Ask Mr. Liddy to step forward, please.

(Defendant Liddy approached the lectern.)

THE COURT: Does counsel for Mr. Liddy have anything to say before sentence is imposed in this case?

Mr. Maroulis, I will hear you.

MR. MAROULIS: Yes, sir.

Your Honor has before him the report of the Probation Department and I submitted to the Probation Department some comments that I requested be attached to the Probation Report.

Additionally, I would like to acquaint Your Honor with some other facts. The

Probation Report itself covers the family history of my client and his background rather generally.

In addition to the family history set forth in that report, I would like to acquaint Your Honor with the fact that my client has throughout his adult life been very interested and involved with the law.

He attended Fordham University, then was in the Army as a first lieutenant in the artillery; he attended Fordham Law School where he served on the Law Review; thereafter, he worked for the FBI from 1957 until 1962.

He was commended several times by the Late J. Edgar Hoover for unusual initiative, aggressiveness and resourcefulness, excellent skill, ingenuity and performance. His performance reflected a great deal of credit on himself and the FBI. Those were the substance of the commendations.

Early in the 1960s he was with an FBI team that resulted in the capture of a Mr. Tate who was then on the tenmost-wanted list of the FBI.

At the age of 29 he was a bureau supervisor on the staff of the FBI at the National Headquarters.

He was the author of a motion picture, "Stay Alert and Stay Alive," which is used by the FBI to train agents and police in the techniques of arrest, which in and of itself may be responsible for the safety of many police officers.

He was a prosecutor from 1966 to '68 in Dutchess County, New York and led the raid on the Dr. Leary estate.

He was narrowly defeated in 1968 for Congress. He thereafter was a special assistant to the Secretary of the Treasury for organized crime, served on the Presidential Task Force for Drug Abuse and was involved very heavily in Operation Intercept.

He served on the working group of the Cabinet Committee on heroin, served on the Task Force on explosives control leading to explosive control legislation which he wrote a good deal of.

He contributed also to the Organized Crime Control Act of 1970, thereafter served as an aide to the White House and subsequently as counsel to the Committee to Re-elect the President and counsel to the Finance Committee to Re-elect the President.

Mr. Liddy's life has been one of public service, it has been very deeply involved in the law.

Your Honor is about to pass sentence and upon the passing of sentence and from that point on my client will be deprived of the opportunity to practice law.

I ask the Court to consider that as a major factor on his behalf.

That concludes my remarks, Your Honor.

THE COURT: Now, Mr. Liddy, do you wish to make a statement in your own behalf?

DEFENDANT LIDDY: I have nothing to say, Your Honor.

THE COURT: Or present any information in mitigation of punishment?

DEFENDANT LIDDY: Nothing to say.

THE COURT: I will ask counsel for the Government if he has anything to say?

MR. SILBERT: I do, if Your Honor please.

May it please the Court, Earl Silbert, appearing in behalf of the United States together with Seymour Glanzer and Donald Campbell.

If the Court please, in one sense the offenses of which this Defendant and the other six Defendants have been convicted are the most serious offenses known to the law—not murder, not rape, not armed robbery. The Defendants have been convicted of bugging and wiretapping and housebreaking, crimes ordinarily considered less serious than those just mentioned; but, in another sense, if Your Honor please, and the circumstances of this case, the adverse effects of the crimes of which these Defendants stand convicted are far more

harmful and injurious to the public interest than even an offense as aggravated as murder, rape or armed robbery.

For the right of people to associate, particularly the right of people to associate politically without invasions of their privacy is vital, is essential to our system of Government.

What these Defendants have done, if the Court please, is not only violate the freedom of association of a major political party but perhaps even more important and particularly because of the background and positions of the Defendants Liddy and Hunt and McCord, what they have done is to generate a fear, whether realistic or not, that this illegal activity, wiretapping, bugging and burglary for political purposes, is both widespread and condoned.

Your Honor, in our view it is important that the sentences imposed in this case, sentences which will receive extensive publicity, respond to this fear by deterring future conduct of this kind and by demonstrating that this kind of conduct will not be tolerated.

In view of the symbolic significance of these sentences and notwithstanding the previous substantial public service of at least some of these Defendants and their different personal situations, it is the recommendation of the United States that all Defendants be sentenced to a term of imprisonment.

With respect to the Defendant, Mr. Liddy, particularly, of the seven indicted before Your Honor; and convicted before Your Honor as shown by the evidence, he was the leader, the person with the money and of the seven he was the one whose background and position for the very reasons just cited by his counsel, make his conduct the most blameworthy.

Thank you, Your Honor.

THE COURT: Anything further, Mr. Liddy?

DEFENDANT LIDDY: Nothing at all, Your Honor.

THE COURT: The Court at this time wishes to briefly state some of the considerations which have contributed to its sentencing decisions in this case.

In the first instance, it seems clear that the Defendants realized, at the time they acted, that their conduct violated the law.

Now, it is true that "ignorance of the law is no excuse," and that one may be held accountable for a failure to obey the law whether he has read the statute books or not. Despite this fact, however, the Court believes that the knowing and deliberate violation of laws deserves a greater condemnation than a simple careless or uncomprehending violation.

It is appropriate to consider, in addition, the nature of the misconduct, and the gravity of the offenses committed.

The indictment contains two counts of burglary, a serious crime. Other counts refer to Title 18, United States Code, Section 2511 concerning the privacy of oral and wire communications.

The Senate report on the Bill which included what is now Section 2511 contained the following statement, and I quote:

"The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance . . . No longer is it possible . . . for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concern can be intercepted by a unseen auditor and turned against the speaker to the auditor's advantage."

Section 2511 was designed to prevent this great evil. Obviously, however, it has not stopped these Defendants from knowingly committing the acts of which they stand convicted.

From the evidence presented in the course of these proceedings, the Court has reached the opinion that the crimes committed by these Defendants can only be described as sordid, despicable and thoroughly reprehensible.

The Court has also considered the purposes to be served by imposing sentences in this case.

In view of the foregoing, and taking into account the background of the Defendants, it seems obvious to the Court that rehabilitation is not the principal purpose to be served. Nor is it appropriate to impose sentence here with the intent of satisfying someone's desire for reprisal.

In this matter, the sentences should be imposed with an eye toward a just punishment for the grave offenses committed and toward the deterrent effect the sentences might have on other potential offenders.

I shall not attempt to enumerate every item which the Court has pondered. Numerous other considerations, both favorable and unfavorable to the Defendants, have played a part in the Court's decisions. Suffice it to say that the sentences which the Court will now impose, are the result of careful thought extending over a period of several weeks. I think the sentences are appropriate and just.

Do you want to say anything, Mr. Maroulis, or Mr. Liddy?

DEFENDANT LIDDY: Nothing at all, Your Honor.

THE COURT: Nothing more, all right.

Neither counsel for the Defendant or the Defendant having anything further to say, the Court will now impose sentence.

In Criminal Case No. 1827–72, the Court sentences the Defendant George Gordon Liddy on Count One to be incarcerated for a period of not less than 20 months and not more than five years in an institution to be designated by the Attorney General or his authorized representative, and to pay a fine of $10,000.

On each of the counts Two and Three, the Court sentences the Defendant to be incarcerated for a period of not less than five years nor more than fifteen years and the sentences on Counts Two and Three are to run concurrently with each other and concurrently with the sentence imposed on Count One.

On each of Counts Four, Five and Eight, the Court sentences the Defendant to be incarcerated for a period of not less than 20 months nor more than five years and a fine of $10,000 and the sentences as to imprisonment under Counts Four, Five and Eight are to run concurrently with each other and consecutively with the sentences under Counts One, Two and Three, but the sentences as to the fines are to be cumulative. It being the intention of the Court that the Defendant will serve a total of not less than six years and eight months and not more than tweny years in an institution to be designated by the Attorney General or his authorized representative, and also pay a fine of $40,000 and he is to stand committed until his fine is paid or he is otherwise released in accordance with law.

One of the sections of Rule 32 of the Federal Rules of Criminal Procedure provide in substance that after sentence the Court shall advise the defendant of his right to appeal and if the Defendant is unable to pay the cost of appeal he may apply to the Court for leave to appeal without prepayment of costs. And if the Defendant so requests, the Clerk of the Court shall prepare and file forthwith notice of appeal on behalf of the Defendant and of course the notice of appeal must be filed within ten days of this date.

Now in connection with the question as to whether or not the Court will grant bail in this case pending appeal, or bond, I will hear that matter at the end of the proceedings this morning.

I will ask counsel for Mr. Liddy and Mr. Liddy to take a seat in the courtroom and we will proceed with the others.

Excuse me, one further thing: The Court recommends to the Director of the Bureau of Prisons that he study this case from the standpoint of a suitable place of confinement in a Federal institution. All right.

MR. MAROULIS: Your Honor, if I might request that at this point Your Honor had sent Mr. Liddy to Danbury, that has worked out very well from the point of view of my being able to confer with him and I have been able to see him once each week since Danbury is about one hour from my law office in Poughkeepsie, New York. I would request that there be a recommendation on Your Honor's part that Mr. Liddy be sent back to Danbury.

THE COURT: In this case I will make that recommendation. I don't know whether it will be followed or not, but in his case I will make it.

MR. MAROULIS: Thank you, Your Honor.

DEFENDANT LIDDY: Thank you, Your Honor.

THE COURT: Ask the other five Defendants to step forward, please—Mr. Hunt, Mr. Barker, Mr. Martinez, Mr. Sturgis, and Mr. Gonzalez.

(Defendants approached the lectern with their counsel.)

THE COURT: I will ask counsel for Mr. Hunt if he wishes to make a statement on behalf of his client before sentence is imposed?

MR. BITTMAN: I have a statement to make, Your Honor.

THE COURT: All right, sir.

MR. BITTMAN: My name is William Bittman, attorney for Mr. Hunt.

Your Honor, there stands before you today an unusual man who has pled guilty in an unusual case. At the time he pled guilty, he stated to Your Honor that because of the recent death of his wife which occurred on December 8, 1972, he felt a compelling necessity to avoid a protracted trial. He expressed his hope at that time that Your Honor would take into consideration at the time of sentencing the fact that he freely and voluntarily admitted his guilt prior to the trial.

Let me tell you why he is an unusual man. Mr. Hunt, now 54 years old, has devoted his entire adult life to the service of his country. He has been specially trained by our Government to perform tasks which were crucial to our country's national security. He accepted all his assignments without questioning them. Many of them were extremely dangerous and highly sensitive and therefore was necessary for him to operate on a need-to-know basis.

At this point I would like to briefly summarize Mr. Hunt's life work and contributions to his country.

In 1939 Mr. Hunt was in France as a student. After World War II began he returned to this country and took his degree at Brown University and he immediately volunteered for the United States Navy. He was commissioned at the United States Naval Academy in 1941 and sent on convoy escort duty abroad, this at a time when our country was not at war.

He was injured at sea and Mr. Hunt was hospitalized and eventually given an honorable discharge by the United States Navy.

He became a war correspondent for Life Magazine in the South Pacific and worked in many combat zones. Returning in 1943 and feeling that he could still make a contribution to his country he enlisted in the United States Air Force. He went through the commissioning process and became an instructor at the Air Force Intelligence School in Orlando, Florida.

He then volunteered for the Office of Strategic Services in the unorthodox branch of our military and trained in clandestine work and was sent to the China Theater where he worked for the

remainder of the War with Chinese guerrilla bands against the Japanese occupiers in China. He volunteered to enter the Japanese occupied strongholds of Nanking and Shanghai in the hope of preventing wholesale massacre of prisoners by their Japanese captors.

With this mission accomplished, he returned to the United States in 1949 and was brought back into the United States intelligence community by the employment at the Central Intelligence Agency.

In 1949 until his retirement in 1970, Mr. Hunt served at CIA posts of increasing responsibility in Mexico, Japan, Uruguay, and Spain. He was one of the principal figures behind our Government's successful overthrow of the Communist regime in Guatemala in 1954. For this particular reason Mr. Hunt was selected to perform a similar role in our Government's efforts to overthrow the Fidel Castro in 1960 and 1961. There he came into close intimate contact with Cuban exiles of all walks of life who remained his friends until this day.

Subsequent to the Bay of Pigs Invasion Mr. Hunt served as a personal assistant to CIA Director Allen Dullas until that gentleman's retirement. Because of increasingly serious financial demands by medical bills Mr. Hunt requested retirement from the CIA in 1970 and took a post in private industry.

In 1971 Mr. Hunt was contacted by a member of the Presidential staff and asked to contribute his background knowledge in two specific areas of great significance to our country—combating the influx of foreign narcotics and the declassification of materials of the highest national security significance.

He was also given additional assignments, one of which bore directly upon the increasing problem of leaks of highly classified information.

With Your Honor's permission, I have reviewed the thorough presentence report prepared by Mr. Saunders of the Probation Office.

This report details Mr. Hunt's background, his family situation and his involvement in this case. It discusses certain pressing family problems which exist at this time. On the basis of my experience as both a prosecutor and defense lawyer and the countless presentence reports which I have seen in both capacities, I can say without any reservation that the presentence report before the Court today is as favorable as any that I have ever seen.

I might add at this juncture, Your Honor, the probation report does not contain a recommendation as is customary. I am certain that if it did it would recommend leniency for Mr. Hunt.

The probation report clearly indicates his impeccable and honorable background, his devotion and loyalty to his country and family, and his cooperation and candor with Mr. Saunders in explaining his involvement in this case.

The question that is most frequently asked is why did he become involved in this incident? Mr. Hunt's motive has been explained in the presentence report. He was not motivated by money nor was it vengeance. It was simply a matter of trying to uncover activities which he had been told were illegal specifically the receipt by the Democratic Party and certain of its candidates of foreign moneys. He realizes even though his intentions were not evil his actions were wrongful and he is the first one to now admit that.

I have been told by many judges that sentencing is perhaps the most difficult task a court has to perform, that undoubtedly is true in this particular case because of the public attention it has received.

All that I ask is Mr. Hunt's ultimate fate not be determined on the basis of this furor. I believe on the record of this case and the presentence report Mr. Hunt is entitled to the most favorable consideration by Your Honor.

Recently in January of this year the National Advisory Commission on Crim-

inal Justice Standards and Goals submitted its report after a prolonged study by its distinguished members. I was pleased to serve on the task force of the courts. The Commission and its task force recommended in Standard 5.2 that the following factors among others should be weighed in favor of withholding a disposition of incarceration:

1. The offender's criminal conduct neither cause nor actually threaten serious harm.

2. The offender did not contemplate or intend that his criminal conduct would cause or threaten serious harm.

3. The offender acted under strong provocation.

4. The offender led a law-abiding life for a substantial period of time before commission of the present crime.

5. The offender is likely to respond affirmatively to probationary or other community supervision.

6. The offender's conduct was a result of circumstances unlikely to recur.

7. The character, history and attitude of the offender indicate he is unlikely to commit another crime.

8. Imprisonment of the offender would entail undue hardship to dependents.

I am sure the presentence report, Your Honor, spells that out in great detail. I believe Your Honor quite candidly in applying the foregoing criteria Mr. Hunt qualifies for probation. Of great significance is the fact that no individual has been injured as a result of the activities charged in this indictment. In the depositions taken thus far in the civil case not a single person, not even R. Spencer Oliver has been able to demonstrate any specific injury.

In addition, no one has shown that the information contained in the so-called cause were ever used in any way to the detriment of any persons or entity.

I respectfully submit, Your Honor, with respect to Mr. Hunt a suspended sentence with a probationary period would be consistent with the ABA standards, the Model Penal Code and the Standards of the National Advisory Commission.

In short and in conclusion, in my opinion it would be the best interest of justice in all respects.

THE COURT: I will ask Mr. Hunt if he wishes to make a statement at this time in his own behalf or present any evidence or information in mitigation of punishment?

DEFENDANT HUNT: I should like to make a statement, Your Honor.

Your Honor, I stand before you a man convicted first by the press then by my own admissions freely made even before the beginning of my trial. For 26 years I served my country honorably and with devotion first as a Naval officer in wartime in the North Atlantic and then as an Air Force officer in China and finally as an officer of the Central Intelligence Agency combating our country's enemies abroad.

In my entire life I was never charged with a crime much less convicted of one.

Since the 17th of June I lost my employment and then my beloved wife both in consequence of my involvement in the Watergate affair.

Today I stand before the bar of justice alone, friendless, ridiculed, disgraced, destroyed as a man. These have been a few of the many tragic consequences of my participation in the Watergate affair and they have been visited upon me in overwhelming measure.

What I did was wrong, unquestionably wrong in the eyes of the law and I can accept that. For the last nine months I have suffered an ever-deepening consciousness of guilt as a responsibility for my acts and of the drastic penalties they entail. I pray, however, this Court and the American people can accept my statement today that my motives were not evil.

This Court is about to impose sentence upon me. It is my understanding that three principal factors are taken into consideration in arriving at an ap-

propriate sentence. The first is the character of the offender, whether his life represents a cycle of criminality or whether he is a first-time offender.

The second factor as I understand it is the extent to which the offender represents or is likely to represent a danger to society.

The third is the deterrent effect, whether the offender is likely to repeat his offense and whether his fate serves as a deterrent to others who might consider a like offense.

As to myself, Your Honor, the offenses I have freely admitted are the first in the life of a blameless and honorable conduct. As a man already destroyed by the consequences of his acts I can represent no threat to our society now or at any conceivable future time. Added to the factor of deterrents, Your Honor, the Watergate case has been so publicized I believe it fair to say the American public know the political offenses are not to be tolerated by our society within our democratic system. The American public knows also because of what I did I have lost virtually everything that I cherished in life, my wife, my job, my reputation. Surely these tragic consequences will serve as an effective deterrent to anyone else who might contemplate engaging in a similar activity.

I am entirely conscious, Your Honor, what is done to me from this time on is your hands alone. The offenses to which I pleaded guilty even before the trial began were not crimes of violence to be sure they were an affront to the state but not to the body of a man or to his property.

The real victims of the Watergate conspiracy, Your Honor, as it turned out are the conspirators themselves. But there are other prospective victims.

Your Honor, I am the father of four children, the youngest a boy of nine. Had my wife and I not lost our employment because of Watergate involvement she would not have sought to invest securities for our family in Chicago where she was killed last December. My children's knowledge of the reasons for her death is inirradicable as is mine. Four children and a mother. I ask they not lose their father as well.

Your Honor, I cannot believe the ends of justice will be well served by incarcerating me. To do so would add four more victims, young and innocent victims to the disastrous train of events which I was involved.

I say to you with all candor my family desperately needs me at this time. My problems are unique and real and Your Honor knows what they are. My Probation Officer has discussed them with me at some length.

I have spent almost an entire lifetime helping in serving my country in war and peace. I am the one who now needs help.

Throughout the civilized world we are renowned for our American system of justice. Especially honored is our judicial concept of justice tempered with mercy. Mercy, Your Honor, not vengeance and reprisal as in some lands. It is this revered tradition of mercy that I ask Your Honor to remember when he ponders my fate.

I have lost everything, Your Honor— friends, reputation, everything a man holds dear except my children who are all that remains of a once happy family.

Since the Watergate case began I suffered agonies I never believed a man could endure and still survive. I pleaded guilty as charged of my own free will. Humbly with profound contrition I ask Your Honor look beyond the Howard Hunt of last June 17 to my life as a whole and if it please the Court, to temper justice with mercy. My fate and that of my family, my children, is your hands.

THE COURT: Thank you.

Now, does counsel want to wait till I put the questions to all the Defendants and then summarize whatever statements you want to make?

MR. SILBERT: Yes, Your Honor.

THE COURT: I will ask counsel for Mr. Barker if he wishes to make a statement on behalf of Mr. Barker?

MR. SCHULTZ: Your Honor, Daniel Schultz for Mr. Barker, Mr. Martinez, Mr. Gonzalez, and Mr. Sturgis.

I would like to make a brief statement with respect to all four of my clients, Your Honor.

Your Honor, I cannot add anything about my clients' background which has not been presented to the Court and the very thorough presentence report. I simply want to point out to Your Honor that with the exception of their involvement in this case, their background are one of honor, dignity, and ones which any person would be proud of.

They have devoted the majority of their adult lives to a fight against tyranny, they risked their lives repeatedly for fighting for the principles and the freedom that this country stands for.

They did not realize that their involvement in this case and the activities would constitute a blemish on their lives and on their records.

I believe all this points toward leniency, Your Honor, and in connection with any terms of imprisonment I would specifically request Your Honor to recommend that the Bureau of Prisons give consideration to incarceration at the institution at Eglin Air Force Base in Florida. All four of my clients are from the Miami area, they are not wealthy men and this would allow their families to be able to visit them while serving their time.

Thank you, Your Honor.

THE COURT: Mr. Barker, do you wish to say anything in your own behalf or offer information in mitigation of punishment?

DEFENDANT BARKER: No, sir.

THE COURT: All right, sir.

I take it your statement applies to all four Defendants?

MR. SCHULTZ: Yes, Your Honor.

THE COURT: Mr. Martinez, do you wish to add anything to what your counsel said or offer information in mitigation of punishment?

MR. MARTINEZ: No, Your Honor.

THE COURT: Mr. Sturgis, do you wish to make a statement or offer any information in mitigation of punishment?

MR. STURGIS: No, Your Honor.

THE COURT: Mr. Gonzalez, do you wish to make any statement at all?

MR. GONZALEZ: No, sir, Your Honor.

THE COURT: Very well.

Now, does counsel for the Government wish to make a statement?

MR. SILBERT: If the Court please, the general introductory comments that I made previously apply to all the Defendants in this case.

With respect to the Defendant Hunt, if the Court please, we do think the Court should consider his family situation, the fact he entered a plea of guilty, however, we think the Court should also consider the fact that together with the Defendant Liddy he was an organizer and a leader of this unlawful conspiracy. It was he who recruited the four Defendants from Miami, persons who were persuaded to join this unlawful conspiracy by virtue of their total loyalty to him. It was he who recruited the college student who by the lure of money involved in the criminal conspiracy until he quit the conspiracy.

It is true he has rendered public service, he has had great opportunities, opportunities that he has devoted to the service of his country, but also in a sense as I pointed out before it is that which makes his conduct in a sense so culpable and blameworthy.

With respect to the four Defendants from Miami, I will consider them as a group. These Defendants, if the Court please, voluntarily participated in what were in fact violations of law. As such they were clearly guilty and as Your

Honor knows, we have recommended they be sentenced to a term of imprisonment.

If Your Honor accepts our recommendation, we do think there are two factors we wish to bring to your attention.

First of all, that their participation in this criminal conspiracy was in fact induced by one of the organizers of the conspiracy.

Secondly, it is true they did not cooperate with the Government in this case but I think as Your Honor is well aware throughout this case they were represented by one attorney which in fact as a practical matter made the individual cooperation of any one of them impossible.

Secondly, despite the fact that prior to trial these four Defendants wished to plead guilty. It is a matter of record that their attorney prevented them from so doing and over their objection proceeded to make an opening statement in which he raised a defense for which there is no basis in law. In fact, though these four persons who in effect may be perhaps following orders retained this one attorney. As matters turned out they were his captives in a relative sense, if the Court please, we think though their guilt is clear their moral culpability is of a lesser degree.

Thank you.

THE COURT: All right, let the Defendants be seated.

Now with respect to the five Defendants who have entered guilty pleas, that is, Messrs. Hunt, Barker, Martinez, Sturgis, and Gonzalez, the Court finds that it requires more detailed information before it can make a final determination of the sentences to be imposed.

The Court will therefore implement, at this time, the provisions of Title 18 United States Code Section 4208(b). That section reads as follows:

"(b) If the court desires more detail information as a basis for determining the sentence to be imposed, the court may commit the defendant to the custody of the Attorney General, which commitment shall be deemed to be for the maximum sentence of imprisonment prescribed by law, for a study as described in subsection (c) hereof. The results of such study, together with any recommendations which the Director of the Bureau of Prisons believes would be helpful in determining the disposition of the case, shall be furnished to the court within three months unless the court grants time, not to exceed an additional three months, for further study. After receiving such reports and recommendations, the court may in its discretion: (1) Place the prisoner on probation as authorized by section 3651 of this title, or (2) affirm the sentence of imprisonment, * * * and commit the offender under any applicable provision of law. The term of the sentence shall run from date of original commitment under this section."

Now the effect of the Court's ruling then is this:

First, each of you five Defendants now before me are provisionally committed for the maximum sentence of imprisonment prescribed by law for your offenses.

Second, a study will be conducted under the direction of the Bureau of Prisons. Within three months, the Court will be furnished with the results of this study together with any recommendations made by the Director of the Bureau of Prisons.

Should more than three months be required, the Court may grant time for further study up to an additional three months.

Third, once the studies with respect to each Defendant are completed and the Court has analyzed the information contained therein, the Court will make a final disposition of your cases.

The Court will have basically three alternatives: (1) To affirm the sentence of imprisonment originally imposed, that is, the maximum sentence; (2) to reduce

the sentence of imprisonment as the Court deems appropriate; or (3) to place the Defendant on probation.

In any case, the terms of sentence will begin to run from the date of original commitment.

Now the fact that I am submitting the matter for further study does not mean that I have given little or no thought to a sentencing decision. The Court has already given a great deal of consideration to sentencing in each of your cases. I have carefully studied the presentence reports and the trial transcripts.

Among other things, I have taken into consideration, and will keep in mind, the fact that each of you voluntarily entered pleas of guilty.

On the other side of the scale is the fact that none of you have been willing to give the Government or other appropriate authorities any substantial help in trying this case or in investigating the activities which were the subject of this case.

I think, under the case law, the Court is entitled to consider this fact in determining sentences.

For the record, I will cite two cases which discuss this aspect of sentencing: United States v. Sweig, 454 F.2d 181 (2nd Circuit 1972), and United States v. Vermeulen, 436 F.2d 72 (2nd Circuit 1970) certiorari denied 402 U.S. 911, 91 S.Ct. 1390, 28 L.Ed.2d 653, by the Supreme Court.

I believe I may also properly suggest to you that in the interval between now and when the Bureau of Prisons studies are completed you give serious consideration to lending your full cooperation to investigating authorities.

Now I want to speak plainly about this matter. You will no doubt be given an opportunity to provide information to the Grand Jury which has been, and still is, investigating the Watergate affair and to the Senate Select Committee on Presidential Campaign Activities.

I sincerely hope that each of you will take full advantage of any such opportunity. My sentiments in this regard are identical to those expressed on February 28th of this year by Judge Warren J. Ferguson, a United States District Judge in Los Angeles, California and a man for whom I have the highest admiration. Judge Ferguson has before him a matter which is, in many respects, analogous to this case. That proceeding grew out of certain unlawful transactions revealed a few years ago involving a one-time sergeant major of the Army. This man and others pleaded guilty before Judge Ferguson on the 28th to an information charging them with fraud and corruption in the operation of the United States military clubs in parts of Europe, Viet Nam and the United States. At the time of the plea, Judge Ferguson made a statement which I am going to read now. He has stated the matter exceptionally well. I quote:

"There are various sentencing philosophies: To deter other people from committing crime, to deter the defendant himself from committing other crimes against the Government, to rehabilitate people and all of the other various philosophical reasons why judges sentence people.

"In this case, for various reasons which are not necessary for the Court to express from the bench, I am more concerned that the activities to which you have pled guilty will not occur in the future by any other sergeant of the Army, sergeant major of the Army, any master sergeant of the Army, or any staff sergeant of the Army or anybody else in the military system and I don't know whether or not the three of you are isolated incidents of the things to which you have pled guilty and whether or not it is the system which permitted this activity to take place.

"The things we say here, if I can paraphrase a great President, will not be long remembered. You and I are in-

dividuals and life is pretty slender and what I do to you basically is not going to affect other sergeant majors in the Army and another war that comes along in our future, and they will come. But I want to do all I can to insure that in future wars or future military operations that the system, the system itself, prohibits the conduct to which you have entered your guilty pleas. Because if that is accomplished, then there has been a benefit to the Government, really.

"I don't think the Government wants a pound of flesh out of you. That is very little benefit to the Government. That is very little benefit to society. That is very little benefit to anybody except an expression that society does not approve of the things you have entered your guilty pleas to. But you will pass on and there will be other people taking your place and Wooldridge will be forgotten about and Higdon will be forgotten about and nobody will remember Bass as individuals. There will be a flurry of publicity as a result of your guilty pleas, naturally but in a week or so it will be forgotten about.

"But you see, I don't want it forgotten. So I have told your attorneys that the sentence that I will impose upon you—and I am making no promise of leniencies; I want that clearly and positively understood; I am making no promise of leniency—but the sentence I will impose will depend primarily on whether or not you cooperate with the permanent subcommittee on investigation of the United States Senate and if you are asked to testify and give evidence before that permanent subcommittee and if you testify openly and completely, regardless of what the implications are to yourself or to anyone else or to the system so that the branch of the Government which can take corrective action of the system is able to take action on the system so that this activity simply does not occur again, then I will take

that into consideration because I want to see something beneficial to the Government come out of these proceedings.

"Now, I don't know what the subcommittee will do but I fully expect you to cooperate absolutely, completely and entirely with whoever from that subcommittee, whether it is a Senator or whether it is a staff investigator. Whoever it is who interrogates you, you will openly and honestly testify."

Now I believe that the Watergate affair, gentlemen, the subject of this trial, should not be forgotten. Some good can and should come from a revelation of sinister conduct whenever and wherever such conduct exists. I am convinced that the greatest benefit that can come from this prosecution will be its impact as a spur to corrective action so that the type of activities revealed by the evidence at trial will not be repeated in our nation.

For these reasons I recommend your full cooperation with the Grand Jury and the Senate Select Committee. You must understand that I hold out no promises or hopes of any kind to you in this matter but I do say that should you decide to speak freely I would have to weigh that factor in appraising what sentence will be finally imposed in this case. Other factors will of course be considered but I mention this one because it is one over which you have control and I mean each one of the five of you.

In conclusion, the Court's aim is to acquire a thorough acquaintance with the character and history of the Defendants so as to be able to impose that sentence which most fully comports with justice in each individual case.

Now the Court's order of commitment is as follows:

In the case of the United States of America vs George Gordon Liddy, et al, Defendant No. 2, Everette Howard Hunt, Jr.; Defendant No. 4, Bernard L. Barker; Defendant No. 5, Eugenio Rolando Martinez; Defendant No. 6,

Frank A. Sturgis; Defendant No. 7, Virgilio R. Gonzalez, the Court having decided that it would like further detailed information as a basis for determining the sentence to be imposed in this case, the Court hereby commits the defendants to the custody of the Attorney General pursuant to 18 United States Code, Section 4208(b) for a complete study. This commitment is deemed to be for the maximum sentence of imprisonment prescribed by law. However, it is not a final disposition. The statute provides that the results of such study shall be furnished to the Court within three months unless the Court grants time, not to exceed an additional three months, for further study.

The statute further provides that the term of whatever sentence the Court finally imposes on the defendants shall run from the date of commitment under this section which is, of course, today's date.

Now the Court recommends to the Director of the Bureau of Prisons that he study these cases from the standpoint of a suitable place of confinement in a federal institution.

We will take up the matter involving Mr. McCord. Mr. McCord, step forward.

(Defendant McCord approached the lectern.)

I will ask counsel for Mr. McCord if you have a statement you wish to make on behalf of your client?

MR. ALCH: I do, Your Honor.

Gerald Alch for James McCord.

I make reference, may it please the Court, to Mr. McCord's letter to you of March 19, 1973, a copy of which he provided me during the recess. With specific reference to the next to last paragraph wherein Mr. McCord advised you by letter that he had not discussed the above contents of the letter with me I avow to you that is correct, my first knowledge of the letter came when Your Honor read it from the bench.

In view of its contents and in view of the way I interpret my duty as not only Mr. McCord's lawyer but also as an officer of this court, the remarks which I had prepared are now somewhat less than completely appropriate.

During the recess I had discussed the matter with Mr. McCord in the 20 minutes or so Your Honor afforded us. During that conversation he has authorized me to make the following request of Your Honor:

Mr. McCord does wish to apeak with Your Honor as expressed in his letter. He would like to do so in the presence of counsel if that is possible. The specific information he wishes to discuss with Your Honor I am not privy to, he has not informed me and he has advised me his not informing is intentional on his part.

He asks in view of this request that Your Honor consider a postponement of sentencing on this date and afford Mr. McCord the opportunity of conferring with you. If for any reason Your Honor does not feel that the Court is the appropriate forum or for any other reason the Court does not wish to sit down with Mr. McCord and speak with him, Mr. McCord stands ready to receive any alternative suggestions that Your Honor may propose consistent with the spirit of the letter sent to you.

Should Your Honor agree to this request, and I would submit that in view of Your Honor's remarks just concluded what Mr. McCord proposes is relevant to any sentence to be ultimately promulgated, that sentencing be continued, that Mr. McCord's present bail in the amount of $100,000 surety be continued under the same terms and conditions that are presently in effect, and that Mr. McCord be afforded an opportunity to come forth with any information that he might deem relevant as he has requested of Your Honor.

May I before addressing the Court with regard to other matters pertaining to sentencing respectfully inquire of the

Court as to its position on my request for a continuance?

THE COURT: Mr. Alch, as you probably know, and I am sure many other attorneys know this, the Court has adopted a strict policy not to consult with litigants about their case and I have taken the position, I think, the parties to consult with are the attorneys for the litigants, not to consult with defendants in criminal cases.

I have unsealed the record of the proceedings in my chambers the other day consisting of about 11 pages. It is a matter of record now, I don't know if you had a chance to read it or not.

MR. ALCH: I have not, Your Honor.

THE COURT: It indicates Mr. McCord came into my office the other day and one of my law clerks saw him in the reception room and goes on to state Mr. McCord, I think had this envelope which we just unsealed and wanted to see me and I think the record will show my law clerk, Mr. Azzaro, informed him the Judge does not speak with defendants about cases and he ought to see his attorney. It is in the record. And he indicated the reason why he didn't want to talk to his attorney is explained in the letter. I am not going to go over that statement. It is a matter of record and you can read it.

However, in this particular case—I have never done this before, I don't recall that I have ever done it since I have been on the bench—but if Mr. McCord wants to speak with me privately it can only be done under these conditions: that it can be done in court with the official reporter present—I think you have a tape recorder going, Mr. Reporter—and I will listen to what he has to say and it will be recorded, the Reporter will take notes and he can take the stand like any other witness in a proceeding. However, I will not be in agreement with him that my lips will be sealed regarding anything he might tell me, whether it implicates anybody else or many other people doesn't make any dif-

ference. I choose to release that information to the Senate Investigating Committee or the grand jury, that is my prerogative.

Now you think it over. I am going to grant a continuance in this case because I am not ready to sentence Mr. McCord today. The sentence will be continued until one week from today at 10:00 a. m. Think it over carefully.

Mr. McCord, I will ask you these questions which I asked the other defendants: is there anything you want to say at this time or make a statement in your own behalf or present any evidence in mitigation of punishment?

Mr. MC CORD: No, sir.

THE COURT: Does government counsel have anything to say?

MR. SILBERT: In view of the postponement of sentencing of Mr. McCord, whatever remarks we have will be delayed till that time.

THE COURT: I think we will discuss the question of bond next Friday. We will ask Mr. Liddy to come back and we will meet again at 10:00 o'clock. I have no objection if the surety company will remain on his bond. I take it they have no objection. Anybody here from the surety company?

MR. SHANKMAN: We don't know, yet, Your Honor.

THE COURT: Suppose you have Mr. McCord wait, they have a representative down the hall. You get the approval. 10:00 o'clock next Friday.

MR. SILBERT: If the Court please, with respect to the six other defendants whom Your Honor has imposed a sentence on although on five of them it is not final, the United States would request that they be maintained for a brief period of time in the metropolitan area of Washington. The reason for this is if the Court please, that as we have stated many times and even prior to the trial, it was the intention of this office after sentence had been imposed to bring each of the defendants before the grand jury, the grand jury that

originally returned the indictment in this case. The grand jurors have been notified, the grand jury will be reconvened on this Monday, March 26, and for that purpose, if the Court please, we respectfully request the defendants be retained in this area.

THE COURT: Let me hear from counsel.

MR. BITTMAN: Your Honor, I have no objection to that arrangement if appropriate accommodations can be made available. We have already submitted doctor's reports with respect to Mr. Hunt's health, and if perhaps I could talk to the Marshal's office—

THE COURT: —let me make this suggestion, Mr. Silbert. Let these defendants think over the things I have told them here today, give them a little time to think it over. I think it might be advisable to give them a week to come back here next Friday and in the meantime they have had an opportunity to talk to their counsel, decide whether they want to go before the grand jury or what they want to do and I think I will do that.

MR. SILBERT: Would Your Honor, with respect to Mr. Liddy, since Your Honor imposed final sentence on him permit him to be retained within the area?

THE COURT: Oh, yes, I think so. Instead of taking him back.

MR. SILBERT: For that purpose and may we bring him up on Monday, if the Court please?

THE COURT: We will continue the whole matter one week.

MR. BITTMAN: Your Honor, may I be given permission to discuss this with the Marshal's office?

THE COURT: I don't know that he will get any special treatment, frankly.

MR. BITTMAN: Your Honor, we submitted medical reports with respect to a peptic ulcer condition and—

THE COURT: —I have nothing to do with that.

MR. BITTMAN: But I want to get Your Honor's permission before I attempt to talk to the Marshal's office, otherwise they might say they can't discuss the matter with me and want to bring it to Your Honor's attention at this time.

THE COURT: I will give you permission to talk with Mr. Pappa. I don't know what he will do, I have no control over that. Anything further? This matter is adjourned till next Friday at 10:00 o'clock.

\*   \*   \*   \*   \*   \*

## CERTIFICATE

It is certified the foregoing is the official transcript of the proceedings indicated.

NICHOLAS SOKAL
Official Reporter