UNITED STATES of America

v.

John N. MITCHELL et al.

In re NATIONAL BROADCASTING COMPANY, INC., et al.

Misc. No. 74–128.

United States District Court, District of Columbia.

April 4, 1975.

Floyd Abrams, Eugene R. Scheiman, New York City, Cahill, Gordon & Reindel, Washington, D. C., Henry S. Ruth, Sp. Prosecutor, Peter M. Kreindler, Counsel to the Sp. Prosecutor, Richard BenVeniste, Asst. Sp. Prosecutor, Watergate Sp. Prosecution Force, Washington, D. C., for National Broadcasting Co., Inc., American Broadcasting Companies, Inc., CBS Inc., Radio Television News Directors Association, and Public Broadcasting Service.

William G. Hundley, Plato Cacheris, Hundley, Cacheris & Sharp, P. C., Washington, D. C., for John Mitchell.

John J. Wilson, Whiteford, Hart, Carmody & Wilson, Washington, D. C., for H. R. Haldeman.

Thomas C. Green, Ginsburg, Feldman & Bress, Washington, D. C., for Robert C. Mardian.

William S. Frates, Andrew C. Hall, Frates, Floyd, Pearson, Stewart Proenza & Richman, Miami, Fla., for John Ehrlichman.

Joseph A. Califano, Jr., Richard M. Cooper, Williams, Connolly & Califano, Washington, D. C., and Sidney S. Rosdeitcher, Paul, Weiss, Rifkin, Wharton & Garrison, New York City, for Warner Communications, Inc.

Herbert J. Miller Jr., William H. Jeffress, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D. C., for Richard Nixon.

## MEMORANDUM OPINION AND ORDER

SIRICA, District Judge.

This matter comes before the Court solely for consideration of the narrow issue of the timing of the release, if ever, of certain tapes received in evidence in the case of United States v. Mitchell, et al., CR 74–110. Since this case was returned to the Court by Judge Gesell on January 8, 1975, the Court has given serious consideration to this issue.

As noted by Judge Gesell in his Memorandum and Order of December 5, 1974, 385 F.Supp. 1190, and as further indicated in his Order of January 8, 1975, there are several obstacles which must be overcome before the tapes might be released. Because of the difficulties which Judge Gesell anticipated, including such problems as administration, funds, technology and manpower, he ordered that no attempt to copy the tapes should be made "until after the trial." (Memorandum

and Order, December 5, 1974, at 7, 385 F.Supp. 1190.)

This Court, as the trial court, is well aware of the many problems that must be resolved before any presidential tapes might be reproduced and distributed to the public at large. At present the Court is seriously concerned about the problem of the timing of any release or reproduction of the tapes. On March 6, 1975, the Court presided at a hearing at which counsel for the applicants, as well as Mr. Nixon's attorney and a representative of the Watergate Special Prosecution Force addressed this single issue. At the Court's request briefs were submitted thereafter and the Court took the matter under advisement.

■ All four defendants convicted in the aforementioned criminal trial have filed notices of appeal in the U. S. Court of Appeals for the District of Columbia. Should one or more of the defendants prevail on appeal the case might have to be retried, which would mean that a new jury would have to be empanelled and the evidence resubmitted. Thus, the Court still must be careful to protect the rights of the defendants as well as the integrity of the evidence. Absent some compelling reason, the Court should not take any action which carries the risk of causing possible prejudice to the rights of the defendants should a retrial be necessary.

This much would be expected of any judge and, indeed, no less has been specifically required of this Court by the Supreme Court's opinion of July 24, 1974, in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). After a careful review of the very sensitive matter of requiring a President to produce, pursuant to subpoena, information which he claimed was privileged, the Supreme Court held that the subpoenaed presidential tapes had to be produced by President Nixon for *in camera* judicial inspection. Then the high Court turned to the matter of the enforcement of the subpoena by this Court. Again it stressed the sensitive nature of the presidential tapes, partic-

ularly the privileged or otherwise inadmissible or irrelevant portions, and noted: "We have no doubt that the District Judge will *at all times* accord to presidential records that high degree of deference suggested in United States v. Burr [, 25 Fed.Cas. 30 (No. 14,692d) (1807)] . . . ." *Id.* 94 S.Ct. at 3111. (Italics added.) It is in the light of this solemn responsibility as well as a concern for the rights of the defendants that the applicants' request for immediate access to the tapes must be examined.

Mr. Nixon's attorneys point out that the release of the tapes for reproduction and distribution envisioned by the applicants and their friends would result in the manufacture of permanent phonograph records and tape recordings, perhaps with commentary by journalists or entertainers; marketing of the tapes would probably involve mass merchandising techniques designed to generate excitement in an air of ridicule to stimulate sales. It is further implied that the tape copies would be put to untold varieties of inappropriate and scandalous uses, just as any other commercial recording would be. Thus, it appears to the Court that the rights of the appellants in the criminal case (and many others), might be seriously and permanently damaged as a result of granting the applicants' request for immediate release of the tapes.

The Court is not unmindful of the applicants' positions. However, the authorities and arguments cited by the plaintiffs focus more on the problems of continuing (post-trial) restraints on speech and publication like "gag orders" (and the Court lifted such a restriction in the *Mitchell* case the day the verdict was rendered) than on the problems in delaying the possible release for reproduction and distribution of presidential tapes received in evidence.

■ Furthermore, it bears noting that the transcripts of the desired tapes were made available to the public at the same time the tapes were played to the jury. In light of this fact, the argument

that the public's "right to know" presents a compelling reason for granting immediate access to the tapes must be rejected.

Finally, the Court notes that under Section 104(a) of the Presidential Recordings and Material Preservation Act, Public Law 93–526, December 19, 1974, the Administrator of the General Services Administration was required to submit to the Congress a report proposing and explaining regulations that would provide public access to virtually all of the tape recordings made by and during the administration of former President Nixon. That report was given to the Congress on March 19, 1975.

Section E of the Report deals with the problems involved in the processing of White House tapes. There are approximately 5,000 hours of conversations recorded. The administrator notes that about one-third of the tapes were recorded during the nine months in which some abuse of governmental power may have been discussed and that the tapes for those months will be processed first. He estimates that it will take a year to completely process this first group of tapes (and that it will be six months before any part of them will be released). It will take two more years to finish processing the rest of the tapes. Thus, it will take an estimated three years just to process all the tapes. And it is further estimated that the processing will not even begin for a year and a half. Thus, the Administrator estimates that it will be two years before even the first segments of those tapes will be made available for the public to hear.*

As for making copies of the tapes available to the public, the Administrator states:

[I]n order to prevent unwarranted commercialization, the public will not be allowed to duplicate or buy copies of the tapes during the 3-year process-

ing period. After that time, the Administrator will review the situation to determine whether it is appropriate to allow reproduction of the tapes. General Services Administration, Report To Congress On Title I, E–9 (March, 1975).

█ While it is questionable whether the Report and Regulations apply to the tapes played during the *Mitchell* trial and at issue here, (see generally *Id.* at E–8) nevertheless, the scheduling and timing of the release of the presidential tapes under the Regulations is a very helpful point of reference. Since it will be approximately two years before any presidential tapes will even be made available to the public to listen to under the G.S.A. plan; and since it will be four and one-half years before the Administrator will even consider whether it might be appropriate to make copies of the presidential tapes for public purchase, the Court can see no compelling reason why these tapes received in evidence should be immediately released for possible reproduction and distribution.

Upon careful consideration of these and other factors it is the conclusion of the Court that (1) until the appeals have been decided, the trial of the criminal case is not over, at least for purposes of the release of the tapes received in evidence for copying and distribution; (2) there is no compelling reason for the immediate release of the tapes for the above-stated purposes; and (3) no harm will be done if the possible release of the tapes and any further implementation of the December 5, 1974, 385 F.Supp. 1190, Order is delayed until the appeals in the *Mitchell* case are decided.

Therefore, it is by the Court this 4th day of April, 1975,

Ordered that the applicants' petition for immediate access to the tapes for the purpose of making copies for public distribution be, and the same hereby are, denied without prejudice.

* See Attachment A.

190

SCHEDULE OF PROCESSING AND ACCESS
TO THE WHITE HOUSE TAPES

THREE YEAR INITIAL PROCESSING PERIOD
(All tapes)