UNITED STATES of America

v.

John MITCHELL et al.

Appeal of NATIONAL BROADCASTING COMPANY, INC., et al.

UNITED STATES of America

v.

John MITCHELL et al.

Appeal of WARNER COMMUNICATIONS, INC.

Nos. 75–1409 and 75–1410.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1976.

Decided Oct. 26, 1976.

Rehearing Denied Dec. 3, 1976.

Certiorari Granted March 28, 1977.

See 97 S.Ct. 1578

Floyd Abrams, New York City, for appellants in No. 75–1409.

Joseph A. Califano, Jr., Washington, D.C., with whom Richard M. Cooper, Washington, D.C., and Sidney Rosdeitcher, New York City, were on the brief for appellant in No. 75–1410.

William H. Jeffress, Jr., Washington, D.C., with whom Herbert J. Miller, Jr., Washington, D.C., was on the brief for appellee, Richard Nixon. R. Stan Morenson, also entered an appearance for appellee Richard Nixon.

Henry S. Ruth, Jr., Sp. Prosecutor, Washington, D.C., entered an appearance for appellee United States.

Frank H. Strickler, Washington, D.C., entered an appearance for appellee Haldeman.

Before BAZELON, Chief Judge, MacKINNON, Circuit Judge, and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by BAZELON, Chief Judge.

Dissenting opinion filed by MacKINNON, Circuit Judge.

BAZELON, Chief Judge:

In this action the three commercial television networks joined by the Public Broadcasting System, the Radio Television News Directors Association, and a large manufacturer of phonograph records, seek to inspect and copy those portions of former President Nixon's "White House tapes" that were played before the jury at the criminal trial of several of Nixon's top aides. It is conceded that one who listens to the tapes—the inflections, pauses, emphasis and the like—will be better able to understand the con-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

versations than one who only reads the written transcripts that already have been published. The district court nonetheless held that at least until the former aides' pending appeals from their convictions are decided, the tapes cannot be distributed. We reverse.

### I

On June 17, 1972, five men employed directly or indirectly by the Committee to Reelect the President were arrested inside the Democratic National Committee's offices in the Watergate office building. They were there to photograph documents and to repair a hidden listening device installed during a previous burglary. On September 15, 1972, these men and two others were indicted for conspiracy, burglary, and an unlawful endeavor to intercept wire communications. They were all convicted.[1]

On March 1, 1974, seven additional individuals, including former Attorney General Mitchell and three former top White House aides were indicted for, *inter alia,* conspiring to obstruct justice by concealing the identities of the persons responsible for the Watergate break-in. Trial began in that case on October 1, 1974 and concluded three months later with four convictions and one acquittal.[2]

Prior to trial, the Watergate Special Prosecutor subpoenaed certain tape recordings of conversations between then-President Nixon and his former aides. The President contested the validity of the subpoena, but the Supreme Court eventually upheld it.[3] The tapes were then turned over to the district court which, after listening to them *in camera,* arranged to have a copy made of the admissible and relevant portions. These "edited tapes" were given to the Special Prosecutor. At the trial of Messrs. Mitchell et. al.—hereinafter referred to as "the Watergate trial"—most but not all of the edited tapes—between 16 and 22 hours worth—were played and the reels of tape were introduced into evidence as exhibits. During the playing of the tapes, those in attendance were furnished with earphones and with transcripts prepared by the Special Prosecutor's office. These transcripts were not introduced into evidence; however, the press and public were permitted to retain their copies, and the transcripts were widely reprinted.

On November 12, 1974, six weeks after the Watergate trial had begun, the broadcast-appellants filed a motion before Judge Sirica, the trial judge in the Watergate case, seeking permission to reproduce and broadcast the portions of the tapes introduced into evidence.[4] Copies of the motion

---

1. Bernard Barker, Eugenio Martinez, Frank Sturgis, Virgilio Gonzalez and Howard Hunt entered pleas of guilty in *United States v. Liddy,* 397 F.Supp. 947, the attempt of the first four defendants to withdraw their guilty pleas was unsuccessful, *United States v. Barker,* 168 U.S.App.D.C. 312, 514 F.2d 208, *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975). James McCord and Gordon Liddy were found guilty after trial and their convictions were affirmed by this court. *United States v. Liddy,* 166 U.S.App.D.C. 95, 509 F.2d 428 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975); *United States v. McCord,* 166 U.S.App.D.C. 1, 509 F.2d 334 (1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

2. The four convicted defendants appealed to this court. Three of those convictions were affirmed, *United States v. Haldeman et al.,* No. 75–1381, (D.C.Cir. Oct. 12, 1976), and one was reversed, *United States v. Mardian,* No.

75–1383 (D.C.Cir. Oct. 12, 1976). One defendant pleaded guilty prior to trial; another's case was severed and ultimately dismissed.

3. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

4. The Public Broadcasting System actually did not join the request until the following day. Warner Brothers, the phonograph record manufacturer who is a party to this case, filed its request several weeks later.

Two months before the networks filed their motion, a CBS correspondent had written a letter to Judge Sirica on behalf of two other television correspondents and himself, requesting, *inter alia,* that the tapes be made available to the news media during the trial. Judge Sirica asked then-Chief Judge Hart for his advice; after consulting with many of his colleagues Judge Hart informed Judge Sirica that

were served on all parties to the trial and on former President Nixon. Judge Sirica decided that the movants lacked standing to make a motion in the criminal case, and therefore directed that the motion be turned into a miscellaneous civil action. He gave all persons desiring to respond one week to do so. Since Judge Sirica did not have time to study the request during the Watergate trial, the action was referred to another district judge, Judge Gesell.[5] Judge Gesell directed the Clerk of the Court to prepare a report on the feasibility of reproducing the tapes.

On November 26, 1974, the Clerk filed an affidavit indicating that reproduction seemed practicable. He reported that two copies of the "edited tapes" already had been made, so that while one was being played in the courtroom the other could be used to produce additional copies. He further reported that the machinery for making copies was available to the Office of Special Prosecutor; that their professional engineer was willing to assist in the reproduction for his standard fee; and that a deputy clerk could be made available to assure that only those portions of the tapes that were actually played into evidence would be reproduced. He estimated that to make one complete copy would take five to seven days and roughly 50 reels of tape, at a cost of $4 or $5 per reel.

On the same day that the Clerk's affidavit was filed, the Government and Mr. Nixon filed memoranda responding to the broadcasters' motion. The Government stated that it did "not foresee that the

rights of the defendants or of the United States to a fair trial would be jeopardized if the motion is granted," and therefore did not oppose the motion. Mr. Nixon did offer opposition, contending that to grant the motion would:

> have the effect of further intruding on the policies underlying the privilege of confidentiality for presidential communications, of further invading Mr. Nixon's privacy, of further embarrassing him and others whose voices appear on the tapes . . . and of further invading the privacy and causing embarrassment to persons or groups not participating in the conversations but who are mentioned therein . . .

On December 5, 1974, Judge Gesell entered an opinion upholding appellants' right to inspect and copy the tapes.[6] He found that the court's routine practice was to provide copies of exhibits when requested, and that this practice "reaches far back into our common law and traditions."[7] He concluded that Mr. Nixon's interest in avoiding embarrassment did not justify deviating from the practice.[8] Because of anticipated "administrative and mechanical difficulties," however, Judge Gesell decided that no attempt should be made to copy the tapes before the Watergate trial, which was then in its final stages, had ended.[9] At the same time, he requested the parties to submit concrete proposals that would enable the tapes to be released after trial on a nonprofit basis, "without special favoritism or priority" to all persons desiring copies.[10]

it was their unanimous conclusion that release of transcripts "would appear to constitute more than adequate disclosure." Judge Sirica informed CBS by letter that he agreed with that conclusion.

5. Before ruling on the standing issue, Judge Sirica had referred the networks' application to Chief Judge Hart, who in turn asked Judge Gesell to study the matter and report at an Executive Session of the Court. After Judge Sirica decided to convert the application into a civil case, Judge Hart specially assigned the case to Judge Gesell.

6. United States v. Mitchell, D.C., 386 F.Supp. 639 (1975).

7. Id. at 641.

8. Id. 642.

9. Id. at 643.

10. Id. After issuing his opinion, Judge Gesell denied a motion to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (1970), reasoning that, "[t]he final order must be settled before some of the underlying questions of law . . . can be properly resolved. Certification of an abstract legal issue at this stage would delay the ultimate determination of the issues."

In response to Judge Gesell's request, the appellants jointly filed a two-part proposal. The first part concerned preparation of a master tape: appellants proposed that the engineer who had made the copies of the "edited tapes" be retained to make a master copy, and they made suggestions as to the equipment to be used, the size of the reels, the playing speed, and various other details. The appellants agreed to assume all costs incurred in preparing the master. The second part of appellants' proposal concerned distribution: they offered to suggest the names of firms that could duplicate copies at a rapid rate (15 per day) and reasonable price ($2.20–$4.00 per reel), and suggested a two-stage distribution: first, a simultaneous delivery to all persons who made requests within 5–10 days of an initial public notice; and second, either a first come first serve delivery or a delivery at fixed intervals to all those making subsequent requests. Appellants proposed that a deputy clerk be appointed to administer the entire plan.

On January 8, 1975, Judge Gesell rejected this plan.[11] He criticized it for failing (a) to provide for distribution without profit; (b) to attempt to minimize "commercialization" and "undignified use[s]"; and (c) to identify a person or agency to administer the plan. He stated that the Court was ill-equipped to assume the administrative responsibility, and that the burden was on the appellants to develop an adequate proposal. Because the Watergate trial had ended, Judge Gesell transferred the case back to Judge Sirica.

On March 6, 1975, Judge Sirica held a status hearing at which he requested the parties to submit briefs on whether the Watergate trial had "ended" for purposes of Judge Gesell's earlier decision denying release of the tapes until the trial was over. On April 4, 1975, Judge Sirica issued an opinion on "the narrow issue of the timing of the release."[12] He found that distribution of the tapes, and the mass marketing that would result, could prejudice the rights of the Watergate defendants should their convictions be reversed and a new trial be required.[13] Reasoning that this possible prejudice outweighed any interest in immediately releasing the tapes, the court denied "without prejudice" the appellants' applications.[14] Appellants brought this appeal.

## II

### A

The common law has long recognized a right to inspect and copy public records. In England, the right was narrowly circumscribed, and only a limited number of persons enjoyed it.[15] But the American courts tended to view any limitation as "repugnant to the spirit of our democratic institutions,"[16] and therefore granted all taxpayers and citizens access to public records.[17] It was the courts' view that "no sound reason [could be] advanced for depriving a citizen of his right; for it is evident that the exercise thereof . . . will serve as a check upon dishonest public officials, and will in many respects conduce to the betterment of the public service."[18]

11. *Id.* (Order of January 8, 1975).

12. *United States v. Mitchell,* 397 F.Supp. 186, 187 (D.D.C.1975).

13. *Id.* at 188.

14. *Id.* at 188–189.

15. H. Cross, The People's Right to Know 25 (1953); 66 Am.Jur.2d *Records and Recording Laws* § 15 (1973).

16. *Nowack v. Fuller,* 243 Mich. 200, 219 N.W. 749, 750 (1928).

17. *See, e.g., State ex rel. Colescott v. King,* 154 Ind. 621, 57 N.E. 535 (1900); *Nowack v. Fuller,*

*supra* note 16; *Fagan v. State Board of Assessors,* 80 N.J.L. 516, 77 A. 1023 (1910); *State ex rel. Wellford v. Williams,* 110 Tenn. 549, 75 S.W. 948 (1903); *Clement v. Graham,* 78 Vt. 290, 63 A. 146 (1906); *Payne v. Staunton,* 55 W.Va. 202, 46 S.E. 927 (1904). See also H. Cross, *supra* note 15, at 56; Project, *Government Information and the Rights of Citizens,* 75 Mich.L.Rev. 971, 1179 (1975); Note, *The Public Right of Access to Government Information Under the First Amendment,* 51 Chi.Kent.L. Rev. 164, 169 (1974).

18. *State ex rel. Colescott v. King, supra* note 17, at 538.

■ That the common law right to inspect public records extends to judicial records is clear. As Judge Gesell observed, the right to inspect and copy judicial records in this jurisdiction has been settled at least since 1894, when, in *Ex parte Drawbaugh,* 2 App.D.C. 404 (1894), this court rejected an appellant's attempt to seal the records in his appeal.[19] What we said then remains equally true today: "Any attempt to maintain secrecy, as to the records of this court, would seem to be inconsistent with the common understanding of what belongs to a public court of record, to which all persons have the right of access . . . ." *Id.* at 407. Indeed, the importance of "public exposure to trial court proceedings," and the existence of a right to inspect judicial records was recently reaffirmed by the District of Columbia Court of Appeals.[20] And in other jurisdictions the right of access to judicial records is equally well-settled.[21]

This common law right is not some arcane relic of ancient English law. To the contrary, the right is fundamental to a democratic state. As James Madison warned, "A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy: or perhaps both. . . . A people who mean to be their own Governors, must arm themselves with the power which knowledge gives." [22] Like the First Amendment, then, the right of inspection serves to produce "an informed and enlightened public opinion." [23] Like the public trial guarantee of the Sixth Amendment, the right serves to "safeguard against any attempt to employ our courts as instruments of persecution," to promote the search for truth, and to assure "confidence in . . . judicial remedies." [24] And in the instant case, like the Fifth and Fourteenth Amendments, the right of inspection serves to promote equality by providing those who were and those who were not able to gain entry to Judge Sirica's cramped courtroom the same opportunity to hear the White House tapes.

**19.** *Cf. also District of Columbia v. Bakersmith,* 18 App.D.C. 574 (1901).

**20.** *United States v. Burka,* 289 A.2d 376 (D.C. Ct.App.1972).

**21.** *See, e. g., Ex parte Uppercu,* 239 U.S. 435, 36 S.Ct. 140, 60 L.Ed. 368 (1915) (available to litigant); *In re Mosher,* 248 F.2d 956, 45 C.C. P.A. 701 (1957); *Garfield v. Palmieri,* 193 F.Supp. 137, 143 (S.D.N.Y.1961) (dictum), *aff'd,* 297 F.2d 526 (2d Cir.), *cert. denied,* 369 U.S. 871, 82 S.Ct. 1139, 8 L.Ed.2d 275 (1962); *Sloan Filter Co. v. El Paso Reduction Co.,* 117 F. 504 (C.C.Colo.1902); *Jackson v. Mobley,* 157 Ala. 408, 47 So. 590 (1908); *Daly v. Dimock,* 55 Conn. 579, 12 A. 405 (1887); *State ex rel. Hurd v. Davis,* 226 Ind. 526, 82 N.E.2d 82 (1948); *New York Post Corp. v. Leibowitz,* 2 N.Y.2d 677, 163 N.Y.S.2d 409, 143 N.E.2d 256 (1957); *State ex rel. Williston Herald Inc. v. O'Connell,* 151 N.W.2d 758 (N.D.1967); *Charlottesville Newspaper Inc. v. Berry,* 215 Va. 116, 206 S.E.2d 267 (1974). *See also* H. Cross, *supra* note 15, at 135–52; 20 Am.Jur.2d *Courts* § 61 (1965); 76 C.J.S. *Records* § 36 (1952); Annotation, *Restricting Access to Judicial Records,* 175 A.L.R. 1260 (1948).

That the tapes are not writings does not take them outside the common law right to inspect. *See, e. g., Menge v. City of Manchester,* 113 N.H. 533, 311 A.2d 116 (1973) (right to copy magnetic computer tape); *Oritz v. Jaramillo,* 82 N.M. 445, 483 P.2d 500 (1971) (same); *cf.* 28 U.S.C. § 753(b) (1970) (right to inspect court stenographer's notes or mechanical recordings as well as the transcript).

**22.** Letter from James Madison to W. T. Barry, August 4, 1822, in 9 The Writings of James Madison 103 (Hunt ed. 1910).

**23.** *Grosjean v. American Press Co.,* 297 U.S. 233, 247, 56 S.Ct. 444, 80 L.Ed. 660 (1936). Indeed, the Supreme Court has indicated that acquiring information qualifies for some First Amendment protection, *see Branszburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), as does receiving information, *see, e. g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (U.S., May 24, 1976). Disseminating information about court proceedings is, of course, constitutionally protected as well. *See e.g., Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941).

**24.** *In re Oliver,* 333 U.S. 237, 270 & n. 24, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948). *See also* 6 J. Wigmore, Evidence § 1834 (3d ed. 1940).

We find no need, and therefore have no occasion,[25] to decide the novel constitutional question of whether a ban on inspecting or copying the tapes would offend the First, Sixth, or Fifth Amendments to the Constitution. We refer to these constitutional provisions simply to underscore the importance of the values that the common law right seeks to protect, and to make clear our duty to tread carefully in this important area.

## B

Appellee does not deny that a common law right to inspect and copy public records exists. Nor does he question its applicability to judicial records. He argues, however, that exhibits are *not* judicial records but are private property temporarily in the custody of the Clerk until the case in which the exhibits are introduced is concluded. He therefore contends that the common law right does not extend to inspections of exhibits.

The short answer to appellee's argument is contained in Rule 10(a) of the Federal Rules of Appellate Procedure, which provides that: "The original papers *and exhibits* filed in the district court . . . shall constitute the record on appeal" (emphasis added).[26] This rule is buttressed by the *Manual for the Clerks of the United States*

*District Courts,* prepared by the Judicial Conference of the United States pursuant to statutory authority,[27] which classifies exhibits as "auxiliary case records," and, as Judge Gesell noted, requires that documentary exhibits be retained in the case file in cases of historical significance, a category into which the Watergate case readily falls.[28]

The Rules and the *Manual* could, perhaps be overlooked if either logic or experience so required. Neither do. Denying public access to real and documentary evidence would be inconsistent both with the common law's attempt to provide the public with complete information and with what Judge Gesell found to be the district court's practice of providing copies of documentary and photographic exhibits on request.[29] To be sure, once a case is concluded, exhibits generally are returned to their owners,[30] primarily because it is impractical to retain the exhibits in the courthouse.[31] But appellee has not offered a single reason for denying public access to exhibits while they are in the Clerk's custody. Nor has appellee justified classifying documentary exhibits in historically significant cases as judicial records but denying that classification to non-documentary exhibits in such cases or to all exhibits in cases not of historical impact.

**25.** *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**26.** *See also* F.R.A.P. 11(a) (the record "including the transcript *and exhibits* necessary for the determination of the appeal, shall be transmitted to the court of appeals"); *id.* 11(b) ("documents of unusual bulk and *physical exhibits* other than documents shall not be transmitted . . . .").

**27.** 28 U.S.C. § 457 (1970).

**28.** Administrative Office of United States Courts, Manual for Clerks of United States District Courts § 201.1, 201.2(F)(1) (1966), ch. 13, Ex. 2, at 4–5, 16 (1954). *See also Allen v. Lackey,* 199 Okl. 513, 188 P.2d 215, 217 (1947) (exhibits "are a part of the court's records and as such are in the custody of and subject to the control of the court"). *But see King v. King,* 25 Wyo. 275, 168 P. 730 (1917).

Appellee's reliance on *United States v. Monjar,* 154 F.2d 954 (3d Cir. 1946), is misplaced. Although the court there did say that the possession by the Clerk of exhibits was "at least in one sense, that of mere custodian," *id.* at 957, the court immediately indicated that it "did not intend to imply that the absolute control of exhibits introduced into evidence in a trial in a district court of the United States does not rest in that court," *id.* at 958. Indeed, the ultimate result in *Monjar* was that the Clerk was to retain the exhibits for a reasonable time so that Pennsylvania could litigate in Delaware courts the question of whether a Pennsylvania subpoena could reach documentary evidence located in Delaware.

**29.** 386 F.Supp. at 641.

**30.** Rules of the United States District Court for the District of Columbia, Rule 2–10(b).

**31.** *Clerks Manual, supra* note 28, at § 207.1.

Appellee does point to examples of exhibits, such as pornographic movies and tapes of wiretapped conversations, that arguably should not be subject to public inspection. But while these hypotheticals may justify a power to deny public access in special cases,[32] they do not justify a total ban on inspection. We therefore hold that the common law right to inspect and copy judicial records extends to exhibits.[33]

### III

▪▪▪ The right of access to judicial records has never been considered absolute. To the contrary, courts always have asserted the power to seal their records when deemed necessary.[34] Because no clear rules can be articulated as to when judicial records should be closed to the public, the

decision to do so necessarily rests within the sound discretion of the courts, subject to appellate review for abuse.[35]

▪ To say that discretion exists, however, is not to say, as appellee contends, that what is involved here "is simply a policy determination."[36] Appellants seek to vindicate a precious common law right, one that predates the Constitution itself.[37] While the courts have sanctioned incursions on this right, they have done so only when they have concluded that "justice so requires."[38] To demand any less would demean the common law right.

▪ A serious question exists as to whether sealing transcripts of proceedings held in open court or exhibits displayed in open court is ever justifiable. We have

**32.** *See* text at note 34 *infra.*

**33.** The result we reach is in accord with the only case we have found in which inspection of exhibits was sought. *Sloan Filter Co. v. El Paso Reduction Co.,* 117 F. 504 (C.C.Colo. 1902).

**34.** *See, e. g., C. v. C.,* 320 A.2d 717 (Del.1974); *Sanford v. Boston Herald Traveler Corp.,* 318 Mass. 156, 61 N.E.2d 5 (1945); *In re Caswell,* 18 R.I. 835, 29 A. 259 (1893); H. Cross, *supra* note 15, at 149–51; 76 C.J.S. *Records* § 36, at 140 (1952).

**35.** *See* cases cited note 34 *supra.* Appellee argues that given the procedural posture of the case, our review of the district court's discretionary decision should be even more limited than usual. The major premise for this argument is that the district court did nothing more than stay action on appellant's request for the tapes pending the decision in *United States v. Haldeman et al., supra* note 2. Since stays are reviewable only by mandamus, *Dellinger v. Mitchell,* 143 U.S.App.D.C. 60, 442 F.2d 782 (1971), appellee urges upon us the limited review appropriate in mandamus cases: determining whether "the trial judge misconceived the nature of his discretion or otherwise considered an irrelevant factor or refused to consider a relevant factor." *Colonial Times, Inc. v. Gasch,* 166 U.S.App.D.C. 184, 509 F.2d 517, 524 (1975). For three reasons, however, we reject appellee's premise.

First, in form the district court did not stay action; it "Ordered that the applicants' petition . . . [is] denied without prejudice." 397 F.Supp. at 189. Second, the substance of the district court's decision was *not* that adjudication of appellants' claim should be deferred, but

that relief should be deferred. The district court's label, a "dismissal without prejudice," thus was appropriate, as was appellants' appeal under 28 U.S.C. § 1291. *See e. g., United States v. Wallace & Tiernan Co.,* 336 U.S. 793, 795 n.1, 69 S.Ct. 824, 93 L.Ed. 1042 (1949); 9 J. Moore, Federal Practice ¶ 110.13[1] (1975). Finally, after the appeals in the Watergate case are adjudicated, appellants will no longer be able to press their contention that the district court's concern over prejudicing a possible retrial, *see infra,* does not justify withholding the tapes. Thus, under the "practical" approach to "final orders" delineated in *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the district court's decision is appealable as of right.

The appealability issue is not dispositive in any event, since as explained *infra,* it is our view that the district court did misconceive the nature of its discretion.

**36.** Brief at 43.

**37.** That at least some appellants assert this precious right in order that they might personally profit in no way diminishes their status as rightholders. *Cf. e.g., Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

**38.** *See* sources cited note 34 *supra; cf., e.g., MacEwan v. Holm,* 226 Or. 27, 359 P.2d 413 (1961) (placing burden on opponent of disclosure with respect to non-judicial records); *State ex rel. Youmans v. Owens,* 28 Wis.2d 672, 137 N.W.2d 470 (1965), *modified on other grounds,* 28 Wis.2d 685a, 139 N.W.2d 241 (1966); Note, *supra* note 17, at 172.

found no cases in which an attempt has been made to do so. Rather, the general rule is that "[a] trial is a public event," and "[w]hat transpires in the court room is public property." [39] It is not necessary for us to decide, however, whether the right to inspect evidence introduced in open court is absolute. It suffices to note that once an exhibit is publicly displayed, the interests in subsequently denying access to it necessarily will be diminished. And here we conclude that the district court abused its discretion in allowing those diminished interests in confidentiality to interfere with the public's right to inspect and copy the tapes.

### A

The court justified its decision primarily in terms of the potential for prejudice to the rights of the Watergate defendants should their convictions be reversed and a new trial be sought by the Government. It stated that it was unwilling to "take any action which carries the risk of causing possible prejudice" absent a compelling reason to do so, and it found no such reason to be present. [40]

■ In requiring appellants to demonstrate a "compelling reason" for exercising their rights, however, the court misconceived the nature of its discretion. The question the court should have addressed was whether appellee, who sought to interfere with a fundamental common law right, had sustained his burden of demonstrating that justice required denying access to the court records.

■ Once the question is recast in these terms, the answer becomes inescapable: the "*risk* of causing *possible* prejudice" at a *hypothetical* second trial does not justify infringing appellant's right to inspect and copy the tapes. This is true here for at least three reasons.

First, the very fact that a second trial is only a possibility makes the interest in preventing prejudicial publicity less than compelling. [41] If the chance of a retrial justifies interfering with the common law right of access here, then the public can be denied permission to inspect indictments, motions, transcripts, exhibits, or opinions in every case of public importance, at least until all appeals are exhausted. Moreover, even if

**39.** *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). The interests served by the common law right of access to judicial proceedings are closely related to First Amendment interests. *Cf. Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (U.S., June 30, 1976). In the *Nebraska Press* case, the Court held that the First Amendment prohibited a judicial "gag order," which barred publication of information which might prejudice the defendant's right to a fair trial. The Court reserved judgment as to whether proceedings could be closed to prevent prejudicial publicity. *Id.* at 563–565, 96 S.Ct. 2805. Once an open hearing has been held, however, there is an especially heavy presumption against restraints on reporting, which was not overcome. *Id.* at 424 U.S. 559–560, 568, 96 S.Ct. at 2803, 2807.

*See also In re Washington Post Company,* No. 76–1695 (4th Cir., July 21, 1976), and *Miami Herald Pub. Co. v. Collazo,* 329 So.2d 333 (Fla.App.1976). In *Washington Post,* the trial judge in a much-publicized criminal case involving a high government official had ordered that all filings in the case be sealed from inspection by the press or public; the Fourth Circuit concluded that the order constituted "an unnecessary prior restraint on freedom of the press . . .," and ordered it vacated.

In *Miami Herald,* the trial judge ordered the terms of a settlement in a tort suit against the city of Miami sealed from inspection. The appellate court reversed this order, noting that the "right of the press and public to know should weigh heavily against a possible tendency to influence pending cases, particularly in borderline situations . . . ." *Id.* at 338.

**40.** 397 F.Supp. at 188–89.

**41.** This court has recently completed its consideration of the appeals of the Watergate defendants, reversing the conviction of defendant Mardian, *United States v. Mardian,* No. 75–1383 (D.C.Cir., Oct. 12, 1976), and affirming the convictions of all other defendants, *United States v. Haldeman,* No. 75–1381 (D.C.Cir., Oct. 12, 1976). With respect to those defendants whose convictions were affirmed, the possibility of a second trial—and hence of any prejudice from release of the tapes—has obviously been significantly reduced. Although defendant Mardian is now entitled to a new trial, this does not, for reasons discussed *infra,* alter our conclusion that interference with appellants' right to inspect and copy the tapes is not justified on the facts of this case.

the appeals were to end unsuccessfully there would still be a lingering possibility that a successful collateral attack would lead to a new trial. Thus, the logical conclusion of the district court's opinion may well be that which Mr. Nixon draws: "there may *never* come a time when . . 'by lapse of time the danger of the prejudice may reasonably be thought to have been substantially removed.' " [42]

 Second, assuming *arguendo* that the risk of prejudicing a hypothetical second trial can ever justify restricting access to judicial records, the risk here is not sufficiently grave. Appellants are not seeking access to an inadmissible confession, a list of prior convictions or other prejudicial evidence that, although part of

the court's records, was kept from the jury.[43] Rather, appellants seek tape recordings from which inadmissible statements have been carefully eliminated. These tapes were played to the jury, and presumably will be replayed at any retrial.[44] The transcripts of these conversations have received wide circulation and have been reenacted in various forums.[45] We seriously question whether listening to the tapes prior to a retrial would render every listener incapable of "lay[ing] aside his impression or opinion and render[ing] a verdict based on the evidence presented in court." [46]

Finally, it is of no small significance that at the time the district court issued its opinion, neither the Government nor any of the Watergate defendants had objected to releasing the tapes.[47] The defendants' si-

---

**42.** Brief of Appellee at 42, *quoting Delaney v. United States*, 199 F.2d 107, 114 (1st Cir. 1952).

A portion of the news value of such materials may be irrevocably lost by even a temporary delay. *See Nebraska Press Assn. v. Stuart, supra* note 39, at 427 U.S. at 559–561, 96 S.Ct. at 2803.

**43.** Pretrial publication of information admitted at trial generally has been regarded as posing less of a threat to the impartiality of juries. *Compare, e. g., Stroble v. California*, 343 U.S. 181, 195, 72 S.Ct. 599, 96 L.Ed. 872 (1952), *and United States v. Persico*, 425 F.2d 1375, 1380 (2d Cir.), *cert. denied*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970), *with e. g., Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, (1959), *and United States ex rel. Bloeth v. Denno*, 313 F.2d 364 (2d Cir.), *cert. denied*, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963).

**44.** We take judicial notice that while the appellants in *United States v. Haldeman, supra* note 2, contend that a proper foundation for the tapes was not established at their trial, Brief for Appellant Haldeman at 93–111, and while the admissibility of certain passages is contested, Brief for Appellant Mitchell at 122–51; Brief for Appellant Mardian at 62–84, they are not generally challenging the admissibility of the tapes.

**45.** Indeed, in one respect release of the tapes might diminish the possibility for prejudicial publicity by making unnecessary further reenactments of the conversations which inevitably involve verbal interpretations of the speakers' meaning. *Cf. Nebraska Press Assn. v. Stuart, supra* note 39, 427 U.S. at 565–567, 96 S.Ct. at 2806 (rumors may be more damaging than reasonably accurate news reports).

**46.** *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). Indeed, it seems likely that, without undue effort, it would be possible to empanel a jury whose members had never even heard the tapes. Despite the widespread publicity the "Watergate affair" had received prior to the Watergate trial, 10 of the 12 jurors selected in that case claimed to have followed Watergate casually, if at all. *See* Brief of Appellee at 50 n.76, *United States v. Haldeman, supra* note 2 (citing transcript).

**47.** Subsequently, defendant Haldeman has filed a one sentence statement expressing his belief that the tapes "should not be made public for the reason that such publicity would seriously jeopardize [his] rights to a fair trial in the event his pending appeal . . . results in a grant to him of a new trial." This pro forma statement hardly warrants careful attention. The Government has filed a two page memorandum which states that "[i]t is the belief of the United States that . . . there is little likelihood that republication of copies of the recordings in the future would preclude affording defendants a fair retrial. . . ." The Government adds, however, that it "is unable to conclude with certainty that large scale commercial reproduction and sale of the tapes *would have no impact on the venire at a retrial.*" This qualification does not disturb our basic conclusion, that the Government does not anticipate that release of the tapes would preclude (or even seriously impede) the empaneling of an impartial jury in the event of a retrial.

It is instructive to observe that not even Mr. Nixon initially claimed that release of the tapes would prejudice a possible retrial; that issue was raised by the district court *sua sponte*.

lence suggests that they did not believe their rights would be jeopardized, and their inaction surely would weigh against them were they later to challenge the impartiality of veniremen or jurors based upon exposure to the tapes.[48] Similarly, the Government's decision not to object suggests that it believed release would not make it impossible to empanel an impartial jury.

**B**

Appellants and appellee have briefed the question of whether the district court's decision is justified by a concern for the privacy of the persons whose conversations were taped or by the deference owed to presidential records. That question, however, is not raised by this record. Although Judge Sirica referred to these considerations,[49] he did not base his decision upon them, presumably because Judge Gesell earlier had ruled that they did *not* justify denying access to the tapes.[50] The "narrow issue" before Judge Sirica was "the timing of the release."[51] The privacy and presidential deference considerations appellee relies upon essentially are not relevant to that issue. Thus, the only remaining question is whether Judge Gesell abused his discretion in deciding to permit appellants to exercise their right to inspect and copy the tapes.[52] We answer that question in the negative.

1. *Privacy Considerations.*—Perhaps the most important point to be made about Mr. Nixon's privacy claim is that he is not seeking to protect an expectation of privacy. The tapes already have been played in a public forum. Rather, appellee seeks to avoid only what he terms "intrusion on the sensibilities of those whose voices appear on the tapes."[53] But as appellee concedes, this is not the type of injury against which the law provides protection.[54] The fact that neither the legislatures nor the courts have felt this interest worthy of protection suggests that it is not a substantial basis for infringing the common law right to inspect judicial records.

But even if preventing embarrassment may sometimes justify access restrictions, there is plainly no justification for such restrictions here. The tapes at issue are *not* recordings of bedroom or other intimate conversations, and the embarrassment Mr. Nixon fears is *not* republication of highly personal matters. Rather, we deal with conversations between business associates admitted into evidence as proof of criminal misconduct. The embarrassment Mr. Nixon anticipates is largely that which results whenever misconduct or questionable con-

---

**48.** *See, e.g., Darcy v. Handy,* 351 U.S. 454, 463, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); *Stroble v. California,* 343 U.S. 181, 193–94, 72 S.Ct. 599, 96 L.Ed. 872 (1952).

**49.** 397 F.Supp. at 188. Judge Sirica's reference to the possibility of "mass merchandising techniques designed to generate excitement in an air of ridicule" plainly comes in the context of his discussion of the rights of the Watergate defendants. *Id.* His discussion of the deference owed Presidential tapes admittedly is more difficult to explain.

**50.** 386 F.Supp. at 642. Judge Gesell's decision was the law of the case, and thus was presumptively controlling, *See, e. g., Greater Boston Television Corp. v. FCC,* 149 U.S.App.D.C. 322, 463 F.2d 268, 279 & n.20 (1971), *cert. denied, W.H.D.H., Inc., v. Federal Communications Comm. et al.,* 406 U.S. 950, 92 S.Ct. 2043, 32 L.Ed.2d 338 (1972); 1B J. Moore, *supra,* note 35, at ¶ 0.404 (1965).

**51.** 397 F.Supp. at 187.

**52.** Even this question technically is not before us, since Mr. Nixon has not filed a cross-appeal. But because the relevance of privacy and Presidential deference considerations have been briefed, we feel justified, in the interest of expedition, in discussing the issue.

To some extent, the evils appellee fears may be minimized by the final plan for release of the tapes approved by the district court. The court's power to control the uses to which the tapes are put *once released,* however, is sharply limited by the First Amendment. *See Nebraska Press Association v. Stuart, supra* note 39, 424 U.S. at 559–560, 568, 96 S.Ct. at 2803, 2807. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

**53.** Brief at 47; *see id.* at 49.

**54.** *Id.* at 49 n.22; *see, e. g., Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 493–94, 95 S.Ct. 1029 & sources cited (1975).

duct is exposed. If preventing this "injury" justifies interfering with the public's right to inspect records, then the common law right can always be defeated in criminal cases.[55]

Beyond this, there are a number of factors unique to this case that militate in favor of Judge Gesell's decision. First, the conversations at issue relate to the conduct of the Presidency and thus they are both impressed with the "public trust," [56] and of prime national interest. Second, the fact that the transcripts of the conversations already have received wide circulation makes this unlike a hypothetical case in which evidence previously accessible only to a few spectators will suddenly become available to the entire public. Finally, it seems likely that as a result of the Presidential recordings and Material Preservation Act, the words and sounds at issue here will find a further entry way into the public domain.[57] For all these reasons we are unable to conclude that Judge Gesell abused

his discretion in rejecting the claim of privacy.

*2. Deference to Presidential Conversations.*—In *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court spoke of the "high degree of deference" owed to Presidential conversations.[58] The context of the Supreme Court's statements, however, make clear that its primary concern was with safeguarding the *confidentiality* of such conversations, in order to provide "protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." [59] Thus the Court stated,[60]

[T]he District Court has a very heavy responsibility to see to it that Presidential conversations, *which are either not relevant or not admissible,* are accorded that high degree of respect . . . .

And again: [61]

[T]he District Judge will at all times accord to Presidential records that high de-

---

**55.** As the Senate Committee on Government *Operations* stated, in disapproving proposed G.S.A. regulations, Public Access Regulations § 105–63.402–1(b) (March 19, 1975), reserving to the Administrator the right to restrict access to embarrassing portions of President Nixon's papers taken by G.S.A. pursuant to the Presidential Recordings and Material Preservation Act, Pub.L. 93–526, 88 Stat. 1695, 44 U.S.C.A. § 2107 note (Supp.1976): "Almost by definition, the Watergate affairs are embarrassing, to those who were associated with them." S.Rep. No. 94–368 at 10, 94th Cong., 1st Sess. (1975).

Significantly, under the regulations recently proposed, access to the Nixon papers can be restricted only if release "would constitute a clearly unwarranted invasion of personal privacy or constitute libel or slander of a living person." Public Access Regulations § 105–63.-402–1(b) (April 13, 1976). The Senate rejected almost identical language, Public Access Regulations § 105–63.402–1(b) (Oct. 15, 1975), when submitted in the second draft, S.Res. 428, 122 Cong.Rec. S5290–91 (daily ed. April 8, 1976); whether the Senate will continue to insist on its even more open proposal, S.Rep. No. 94–368, *supra,* remains to be seen.

**56.** *Nixon v. Administrator of General Services Administration,* 408 F.Supp. 321, 358 (D.D.C.), *appeal docketed,* 44 U.S.L.W. 3641 (U.S. May 11, 1976) (No. 75–1605); *see id.* at 358–59 & n. 53.

**57.** *See* note 55 *supra.* As Judge Sirica noted, because of the litigation over the constitutionality of the Act and the time necessary for processing the tapes and papers, release will not be immediate. In addition, once the tapes are made public, there may still be a ban on copying them. That ban will not be for four years as it appeared when Judge Sirica wrote his opinion, *see* Regulations on Access § 105–63.404(c) (March 19, 1975); the Senate rejected that proposed regulation as inconsistent with the spirit of the Act, S.Res. 244, 121 Cong.Rec. S15803–08 (daily ed. September 11, 1975); *see* S.Rep. No. 94–368, at 12–13 94th Cong., 1st Sess. (1975). The newer regulations provide for a two-year ban, Public Access Regulations § 105–63.404(c) (April 13, 1976); whether the Senate will accept this shorter period is uncertain.

**58.** 418 U.S. at 715, 94 S.Ct. 3090.

**59.** *Id.* at 708, 94 S.Ct. at 3107; *see id.* at 711–12, 94 S.Ct. 3090.

**60.** *Id.* at 714–15, 94 S.Ct. at 3111 (emphasis added).

**61.** *Id.* at 715–16, 94 S.Ct. at 3111 (emphasis added).

cree of deference . . . and *will discharge his responsibility to see to it that until released to the Special Prosecutor no in camera material is revealed to anyone. This burden applies with even greater force to excised material.* . .

By definition, however, the tapes played at trial are no longer confidential. Thus appellee is left to argue that somehow it would be "unseemly" to allow tapes of White House conversations to be marketed and publicly distributed. But this is essentially a question of taste; and provides a singularly weak basis for a court to interfere with the exercise of a long-established common law right. Indeed, a substantial argument could be made that it is highly appropriate for recordings of conversations concerning the conduct of public business to be marketed to the public, or at least no more inappropriate than for transcripts of the conversations to be marketed. In any event, in light of the strong interests underlying the common law right to inspect judicial records—interests especially important here given the national concern over Watergate—we cannot say that Judge Gesell abused his discretion in refusing to permit considerations of deference to impede the public's exercise of their common law rights.

### IV

On remand, the parties and the court will have to attempt to develop a plan for release of the tapes. The principles governing release are well set out in Judge Gesell's initial opinion, and are essentially undisputed. Distribution should be prompt, and on an equal basis to all persons desiring copies. The court cannot be expected to assume the cost of distribution, nor should the court's time or personnel be unduly imposed upon. And neither the court, nor any agent it appoints, should profit from

the public's exercise of its common law right. Within these broad limits, the court has considerable discretion.

MacKINNON, Circuit Judge (dissenting):

In my view, at this time, we should affirm Judge Sirica in his decision refusing to permit a reproduction of portions of the tape *exhibits* until the appeals in the relevant cases are decided and the criminal charges disposed of by a final judgment.[1] Access to exhibits in a criminal trial is somewhat different from access to the transcript of oral testimony. Physical exhibits, such as the tapes, are the personal property of the owner, and the usual practice is to return them when the case is finished.[2] The fact that property is used as evidence in a court trial does not divest the owner of his title to it. Also, there is an integrity about real exhibits that needs to be protected until the exhibit is no longer needed *in court*. Tapes are especially subject to the possibility of alteration and erasure, as we all know from the incidents involving these tapes, and should not be subjected to any unnecessary handling that might damage them or constitute good cause in a subsequent trial for a court to reject them as unreliable evidence. Until the criminal trials where these tapes may be used as evidence are completely final and further need for the exhibit is foreclosed, courts and the Government should be concerned that they do not become a party to manufacturing presumptive prejudice against defendants.[3] In view of the possibility of a retrial following the reversal by this court of the Mardian conviction, and the strong possibility of petitions for certiorari that would cause the other convictions to lack finality until the Supreme Court finally rules, it is my opinion that Judge Sirica made a wise decision in refusing the requested reproduction of portions of these exhibits.[4] A significant

---

1. Thereafter, I would not worry about possible collateral attacks.

2. *Cf. United States v. Wilson*, 176 U.S.App.D.C. 321, 540 F.2d 1100 (1976).

3. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Marshall v. Unit-*

*ed States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

4. This case involves a situation where the trial judge acted to assure the integrity of a vital trial exhibit until it was no longer needed for trial purposes. On that basis it is distinguisha-

*reduction* in the possibility of prejudice to a fair trial should not cause a court concerned with constitutional rights to ignore the possibility of prejudice that remains.[5]

I respectfully dissent.

ble from the two cases cited in n. 39 in the court's opinion which did not involve exhibits that might be altered or destroyed by handling, *i.e.: In re Washington Post Company,* No. 76–1695 (4th Cir., July 21, 1976) and *Miami Herald Pub. Co. v. Collazo,* 329 So.2d 333 (Fla.App., 1976). It is doubtful that any person would consider the cases here to involve "borderline situations."

5. *Cf.* Majority opinion, n. 41. Now that the conviction of Mardian has been reversed, the majority opinion reflects a lack of concern for the prejudice it may cause to such defendant when it states that "the very fact that a second trial is *only* a possibility makes the interest in preventing prejudcial publicity *less than compelling.*" Majority opinion, 179 U.S.App.D.C. at ——, 551 F.2d at 1261 (emphasis added).